## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

TRAVIS D. WILLIAMS,

                    Plaintiff,                    OPINION AND ORDER

    v.

                                          16-cv-474-wmc

DR. SALAM SYED, et al.,

                    Defendants.

Plaintiff Travis D. Williams, a prisoner in the custody of the Wisconsin Department of Corrections, previously filed a complaint that included at least six unrelated claims against different defendants in violation of Federal Rule of Civil Procedure 20. As a result, this court permitted Williams the opportunity to amend his complaint. Although Williams' amended complaint still names an undue number of defendants -- thirty -- it is focused on one of the groups of claims outlined in his original complaint: the medical care he received at one institution. Accordingly, his amended complaint meets the requirements of Rule 20 and is now ready for screening pursuant to 28 U.S.C. § 1915A. For reasons explained below, Williams will be permitted to proceed against some of the named defendants on claims under the First, Eighth and Fourteenth Amendments.

## I.       Parties

Williams is presently confined at the Wisconsin Secure Program Facility ("WSPF"), but the allegations in his amended complaint took place while he was incarcerated at Columbia Correctional Institution ("CCI").  All of the named defendants were employed at CCI during the relevant time period:  Drs. Salam Syed, Vickrey, Woods, Norge, Persike, White, Stange, Hoescht and Gambaro; CCI's Americans with Disabilities Act ("ADA") coordinator Schmidt; Officers Bittleman, Roeker, Knapp, Rhode and Roberts; Unit Manager Fry; the warden's secretary Anderson;  nurses Kathleen Whalen, Trisha Anderson, Kari Newberry, Melissa Thorne, Denise Valerius, Meredith Mashak, Chris DeYoung, Candace Warner and Jessie; and other employees Walters, Linda O'Donovan Alsom, Bittleman, Tim Ziegler and Rachel Pafford.

Plaintiff Williams' allegations span from when he first arrived at CCI in 2015 to 2017.  During this time, he alleges claims arising out of a number of mental and physical health issues that the professional care team at CCI regularly and inadequately treated, as well as claims regarding the conditions of his confinement.  The following is the timeline of the care provided for his physical and mental health issues, then a separate discussion of his conditions of confinement allegations.

---

[1] In addressing any pro se litigant's complaint, the court must read the allegations generously. *Haines v. Kerner*, 404 U.S. 519, 521 (1972).  For purposes of this order, the court assumes the following facts based on the allegations in plaintiff's amended complaint.

## II.    Transfer to CCI

On May 5, 2015, Williams was first transferred to CCI from the Dodge Correctional Institution.  Because he was unable to walk up or down stairs or to walk without a cane or walker, Williams was taken to a special management unit upon arrival.  His walker was also immediately confiscated, and he was given a wheelchair despite complaining that he could not use a wheelchair because he has limited use of his left arm after a muscle reattachment surgery.

In addition, all of his medications were taken and sent to the Health Services Unit ("HSU").  By May 9, 2015, some four days later, Williams still had not received the medications he takes for high blood pressure, reflux, schizophrenia and hallucinations, constipation and a lesion.  On May 9 and again on May 16, Williams requested his medications on Health Service Request ("HSR") forms.  Williams acknowledged then receiving responses from nurses Anderson, Whalen, Valerius and Mashak, and being provided both a wheelchair *and* a walker, but alleges that "everything else was deliberately ignored."  During this same time period, Williams also wrote to Dr. Vickrey to ask for his psychotropic medications because he was experiencing hallucinations.  Vickrey responded that he would not yet prescribe the medications because they had still not met, but that the nurses could administer the medications if they had been prescribed for him.

On May 21, 2015, now some 12 days after all medications had been stopped, Williams allegedly told Dr. Valerius that he was still not receiving his medications since his transfer to CCI, but Valerius did not see those prescriptions in his medical file. Williams received most of his medications three days later, while continuing to submit

HSR's requesting the remaining medications and to see a doctor for pain in his shoulder, feet, back, neck, legs and knees. In particular, Williams continued to request but did not receive an ointment he used to treat a sore in his nose until June of 2015. When he received that ointment, Williams used it up quickly and requested a refill, but Anderson, Valerius, Whalen and Mashak were again allegedly unresponsive. Indeed, Williams alleges he had to wait until August of 2015 to get the ointment refilled, which was by then unhelpful because his sore had gotten so much worse.

During this time Williams was further submitting HSR for shoes that properly fit his feet, explaining that he needed special sizing because his feet are two different sizes. Allegedly, Williams submitted a special needs request in July of 2015, but ultimately he was denied the requested shoes, which caused him heel spurs in both feet and a bunion. At that time, Williams was seen by Dr. Hoescht, who discussed physical therapy. Williams told Dr. Hoescht that the exercises previously prescribed for him did not work and actually made his condition worse, he also told Dr. Hoescht that his shoes did not fit and asked for use of a wheelchair, orthotics, a knee sleeve and heel pads, which he had received while at Dodge Correctional. Allegedly, Dr. Hoescht replied that he could not provide him with a wheelchair or get him any of the other items he requested.

On August 13, 2015, Dr. Syed examined Williams, who concluded that Williams did not need his t-band, knee sleeve, arch supports and kneepads. Williams told him about the sore in his nose and that his shoes did not fit, causing a heel spur. Dr. Syed responded by giving him ibuprofen and skin cream, and ordering an ultrasound. Further, Dr. Syed

told Williams that he wanted physical therapy to explain why he needed a wheelchair and walker.

After this appointment, Williams asked for his ibuprofen and skin cream, but Nurse Whalen allegedly told him that there was no such order *and* that there would be no follow up appointment because Williams had threatened the doctor. According to Williams, however, Whalen actually refused his requests because Williams had previously filed inmate complaints against Nurse Anderson, Unit Manager Fry, Dr. Vickrey and her for their decisions denying his requests for medications and special shoes.[2]

In September of 2015, Williams claims he was forced to walk to the law library, and he collapsed on the way. Drs. Gambraro and Norge saw this and asked if he needed help. At that point, staff helped him into a wheelchair and brought him to see Nurse DeYoung, who took his vitals and asked him questions about his health. Williams claims that his chest was hurting throughout their conversation, and he told DeYoung that he was too weak to go back to the unit, but that she ignored these complaints.

On another occasion in September of 2015, Williams claims he was temporarily held in Kenosha County, where he sustained a hand injury from banging on a glass window. Upon his return to CCI, Williams was taken in a wheelchair to the HSU for treatment when Nurse DeYoung was working. Williams claims DeYoung then wheeled him out of the examination room, telling him to submit an HSR to be seen. Between September and

---

[2] Apparently, Whalen ultimately took away his access to a wheelchair. Fry was Williams' unit manager and a member of the special needs committee. Apparently, the special needs committee delayed approving certain items Williams had requested. In particular, Williams did not receive shoes that fit until February 2016, and he did not receive soft shoes until May 2016.

November, Williams submitted numerous HSR's that went unanswered. Finally, Williams had an off-site x-ray in December of 2015. During that transport Williams was placed in handcuffs and required to sit in a wheelchair. Upon his return to the HSU, however, DeYoung again tried to take away his wheelchair and only gave it back to him after a guard insisted that it had been ordered by the shift commander.

## III.     Decision to Transfer to General Population

In October of 2015, Unit Manager Fry, Nurse Whalen, Dr. Vickrey and Dr. Stange were involved in a decision to remove Williams from the special management unit, a decision Williams claims was in retaliation for his inmate complaints against them. Inmates on mental health status received a number of benefits, including additional money, more counseling every week, and priority group counseling. Williams not only claims that the defendants refused to acquire his previous mental health records that would confirm that he needed to be placed in the special management unit, but that only white inmates are placed in that unit.

More specifically, Williams alleges that while in the health care unit on a pass, he spoke directly with Dr. Stange about his placement. When Williams asked why he could not be on mental health status, Stange allegedly surveyed the room and told him to "look around." When Williams saw only white inmates, he asked Stange if she meant that only white inmates are placed on the special management unit.[3] After this conversation,

---

[3] Although not specifically alleged, the court will infer for screening purposes that Stange did not disagree with Williams' observation.

6

Williams wrote to Dr. Woods, and it appears that Dr. Woods agreed with Dr. Stange's statement about the unit placement. Finally, once Williams was in the general population, he asked Dr. Gambaro to be sent back to the special management unit, but Dr. Gambaro refused, allegedly believing that Williams was only trying to be sent there for the special privileges.

## IV.    Treatment in General Population

While in general population, Dr. Vickrey proposed taking Williams off some of his psychiatric medications, ostensibly because it was causing his cholesterol to rise. Williams allegedly objected that he needed his medications to stay mentally stable and that he had assaulted others in the past when not on medication. He also told Dr. Vickrey that he suffered from hallucinations and auditory impairments, suicidal and homicidal thoughts, a history of physical aggression, schizophrenia and chronic mental illness. Regardless, Dr. Vickrey took him off certain medications. Afterward, Williams wrote to Dr. Woods, who refused to place him on special management.

While in general population, Fry and Stange also allegedly denied Williams' requests for a wheelchair and/or walker. This caused Williams to have to slide down the stairs and seek help to go up the stairs. As a result of his difficulties getting around and continued inability to receive responses to his HSRs, Williams injured his shoulder.

In October of 2015, Williams went to the HSU complaining to Nurse Newberry about his nose sore. She told him not to scratch it and to try to pinch his nose when it started bleeding. He also complained about his shoulder, feet and testicle pain, all of which

she refused to address. Williams saw Newberry at a later date about his nose again, at which point Newberry told him she would make sure he received his medication, but then gave him the wrong medication. As a result, Williams continued to suffer nose pain until February of 2016, when he was finally seen by a health care professional at the University of Wisconsin-Madison.

From October of 2015 through January of 2016, Williams further saw Dr. Syed several times for various ailments, including back, feet, testicle and nose pain. Dr. Syed ordered ultrasounds and tried different types of topical treatments for his nose sore, but did not order a CT or MRI. Instead, he prescribed "neurological testing."

In February of 2016, Williams spoke to the warden about Dr. Syed ignoring his complaints -- in particular, his complaints about his nose sore and testicle pain. The warden looked at his nose, and apparently the next day he was taken to see an otolaryngologist ("ENT") at UW-Madison, who used a special procedure to address the infected sore on his nose and afterwards prescribed him antibiotic pills and triple antibiotic ointment. However, when Williams went back to CCI, Nurses Whalen, Anderson and Newberry allegedly denied him the antibiotic ointment that the ENT had prescribed, along with the pills, which caused the infection to come back.

## V.    Meeting with HSU and Subsequent Treatment

Williams then wrote to the warden that the HSU staff were ignoring his requests for care, prompting the warden to set up a meeting between Williams and the HSU Manager. That meeting was originally scheduled to take place in May 2016, but was

pushed back until July 14, 2016. While waiting, Williams claims he was unable to get any sort of medical treatment, allegedly as a result of actions of CCI Officer Bittleman. Williams alleges Bittleman acted in retaliation for his complaints against him. In particular, in April of 2016, Bittleman was allegedly responsible for cancelling Williams' optometrist appointment, teeth cleaning, and psychologist appointment.

During the rescheduled July 14 meeting with HSU, Williams allegedly presented Candace Warner with his "list" of approximately 40 health-related issues. Warner then told Williams that she would set up "a series of appointments" to address his concerns, *and* it appears that Williams went to these appointments, including with Dr. Syed. The purpose of the appointment with Dr. Syed was to examine Williams' nose, renew any necessary medications and set up a sleep study to see whether he needed a CPAP machine. Dr. Syed told Williams that his nose looked fine. Nurse DeYoung, who was in the room for this appointment allegedly gave Williams the middle finger as he was leaving. Moreover, Dr. Syed allegedly saw DeYoung do this, and he did nothing.

After reporting this incident to the warden, Williams was then placed in segregation. While in segregation, Williams was unable to get mental health treatment, even though he wrote to Dr. Persike repeatedly for treatment. It also appears during this time that Williams met with Dr. White, the supervisor of the psychology department, who told Williams that he needed to submit his medication requests to a psychiatrist instead of him. At some point, Williams was examined by a doctor who prescribed him some psychotropic medications, then recommended a follow up appointment in two weeks. Although Dr. Norge told him that there would be another appointment, CCI staff did not schedule one.

## VI.     Treatment for Injuries

On October 3, 2016, Williams had to appear for a disciplinary hearing, and correctional officers Roeker and Knapp put him in restraints and had him use a walker. Ignoring his disability, Williams claims that the officers made him kneel on the ground to apply leg irons. With the restraints, Williams had to strain to get up, ultimately causing him to flip and fall, hurting his arms, wrists, hip and back. Williams was apparently then taken to HSU, where even though injured and suffering, Williams claims Nurse Thorne failed to provide him with any ice or ibuprofen, even after telling him that she would order some for him. On the same day, Nurse Valerius also refused to provide him any sort of treatment for his injury or other ailments. Williams further alleges that he had to wait some nine months to get x-rays for the injury he suffered that day -- until June of 2017. He claims that Thorne and defendant Pafford were involved this long delay, apparently in retaliation for the complaints he filed.

In December of 2017, Williams had a fall and submitted numerous HSR's to be seen for his injuries to his elbow and knees. However, nurses Thorne, Valerius, Anderson, Walters and Jessie did not see him because he was scheduled to see a doctor.


## VII.    Cell Conditions

Finally, at some point between October of 2015 and August of 2016, Williams complained about the conditions of his cell -- specifically, that every time showers were in use, water drained into his cell, and it smelled of urine. The warden's secretary, Anderson,

responded to his letters on this subject by writing that Ziegler and Roberts went to his cell, and they confirmed that there was no urine. Williams claims that this is false.

OPINION

Plaintiff's claims, read generously, implicate the First, Eighth and Fourteenth Amendments, the Americans with Disabilities Act ("ADA"), and Rehabilitation Act, as well as state negligence and malpractice law. The court addresses each below.

I. **Eighth Amendment**

A. **Deliberate Indifference**

Plaintiff claims that many of the named defendants were "deliberately indifferent" to his various "serious medical needs" in violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). A "serious medical need" may be a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584-85 (7th Cir. 2006). "Deliberate indifference" means that the officials are aware that a prisoner needs medical treatment, but disregard the associated risk by consciously failing to take reasonable measures. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Delayed care, even a delay of just a few days, may violate the Eighth Amendment if it caused the inmate's condition to worsen or unnecessarily prolonged his pain. *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment.") (citations omitted);

*Smith v. Knox County Jail*, 666 F.3d 1037, 1039-40 (7th Cir. 2012) (same); *Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011) (same).

Applying these standards, plaintiff's claim of deliberate indifference depends on proof of three elements: (1) plaintiff needed medical treatment; (2) defendants knew that plaintiff needed treatment; and (3) despite their awareness of the need, defendants consciously failed to take reasonable measures to provide the necessary treatment. Plaintiff argues that his alleged mental and physical health needs are sufficient at this early stage to create a reasonable *inference* that he had serious medical needs during the relevant time period. As an initial matter, plaintiff's allegations that he suffers from hallucinations and schizophrenia suggest that his mental health needs are sufficiently serious to constitute a serious medical need. Next, his claims about chronic, painful symptoms related to his nose sore, which required several rounds of antibiotics and multiple visits to an ENT, appear sufficient at this early stage, to permit an inference that his nose issue constituted a serious medical need. Lastly, plaintiff's allegations related to his inability to walk without a walker, wheelchair or special shoes, permit a reasonable inference that his complaints about his shoulder, feet, back, neck, legs and knees constituted a serious medical need.

Thus, the initial question becomes which of these defendants, if any, are alleged to have known about one or more of plaintiff's medical needs but failed to take reasonable measures in response? Plaintiff claims that numerous defendants improperly denied him access to the special management unit, and his allegations related to the special management unit implicate each of them. Specifically, Drs. Vickrey, Stange, Woods and Gambaro, as well as Unit Manager Fry and Nurse Whalen, were allegedly involved in

plaintiff's move into CCI's general population. In addition, plaintiff's allegations about his mental health problems permit, although they do not require, an inference that those same defendants knew either directly or indirectly of his need for additional counseling services and access to medications available on the special management unit. Acccordingly, those defendants' refusal to place him on the special management unit *could* constitute deliberate indifference, and plaintiff will be permitted to proceed against Drs. Vickrey, Stange, Woods and Gambaro, as well as Fry and Whalen, on a claim of deliberate indifference.

Similarly, plaintiff claims that numerous defendants were aware of and acted with deliberate indifference to his needs for proper medical care and a wheelchair or walker, as well as follow up treatment related to his mental health medications and nose sore. In particular, he alleges that:

- Dr. Persike failed to respond to plaintiff's request for mental health treatment when he was in segregation.

- Dr. Norge failed to provide follow up treatment for plaintiff's mental health medications.

- Dr. Syed took away his medical devices and denied him shoes necessary for him to function properly, causing him to have tremendous difficulty walking up and down stairs and leading to injuries.

- Dr. Hoescht refused to provide him with a wheelchair in July of 2015.

- For several months in 2015, nurses Newberry, Anderson, Valerius, Whalen and Mashak each either ignored his complaints about the sore in his nose or failed to provide him with his prescription medications as necessary, which led to an emergency ENT visit.

- In late 2015, DeYoung outright refused to treat plaintiff when he went to the HSU after he fell and when he had a hand injury.

- In the summer of 2016, Bittelman cancelled several of his doctor's appointments, without need or justification.

- In October of 2016 Roeher and Knapp made him put on restraints and walk to a hearing, causing him to injure himself.

- Pafford delayed a necessary x-ray for almost six months.

- Despite plaintiff's injuries following a fall, nurses Thorne, Valerius, Anderson, Walters and Jessie would not provide treatment in December of 2017.

While many of plaintiff's allegations about delayed care are vague and do not provide exact dates, the allegations provide sufficient information for the court to conclude that each of the above defendants both knew that plaintiff needed medical care and/or was in pain, yet either refused to provide treatment, delayed treatment or provided wholly inadequate treatment. Accordingly, the court will permit plaintiff to proceed on deliberate indifference claims against those individuals.

Nevertheless, not all of the defendants were involved in actions that would support a claim for deliberate indifference. In particular, plaintiff has not included allegations suggesting that O'Donovan-Alsom, Rhode and Warner were involved in his mental or physical health care during the relevant time period. Additionally, while he alleges that Warner met with him on July 14, 2016, to discuss his medication issues and told him she would schedule various appointment for him, plaintiff has not alleged that Warner actually provided any further treatment, cancelled any appointments or played a role in his care in any other fashion. Accordingly, he will not be permitted to proceed against those defendants. *See Minix v. Canarecci*, 597 F.3d 824, 833–34 (7th Cir. 2010) ("individual liability under § 1983 requires 'personal involvement in the alleged constitutional

deprivation'").

Furthermore, because any other arguable claims against these defendants stem from unrelated allegations to the deliberate indifference claim, plaintiff cannot proceed against these defendants on any other claims. As plaintiff proceeds, therefore, he should be aware that the court has only permitted him to proceed with respect to the defendants and specific actions described above, and he must similarly limit his discovery requests accordingly. He should similarly bear in mind that proving that claim as to each individual defendant will be difficult. For example, at summary judgment or trial, it will be plaintiff's burden to show that a reasonable jury could find in his favor on each element of his claim or claims against that individual. *Henderson v. Sheahan*, 196 F.3d 839, 848 (7th Cir. 1999). Neither will it be enough for plaintiff to show that he disagrees with defendants' conclusions about the appropriate treatment, *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006), nor even that defendants could have provided better treatment. *Lee v. Young*, 533 F.3d 505, 511-12 (7th Cir. 2008). Plaintiff will have to show that (1) defendants' conduct was "blatantly inappropriate," and (2) defendants knew about obvious, reasonable alternatives, but refused to consider them. *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (internal quotations omitted).

### B.      Conditions of Confinement

Under the Eighth Amendment generally, the government must "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care; and officials must 'take reasonable measures to

guarantee the safety of inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)); *see also Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

To demonstrate that prison conditions violate the Eighth Amendment, a plaintiff must allege facts showing that existing conditions denied him "the minimal civilized measure of life's necessities," *Farmer*, 511 U.S. at 834 (quoting *Rhodes*, 452 U.S. at 347); "exceeded contemporary bounds of decency of a mature, civilized society," *Lunsford v. Bennett*, 17 F.3d 1574, 1579 (7th Cir. 1994). To establish personal liability for such conditions, plaintiff must allege that a prison official or other defendant acted with "deliberate indifference" to those conditions, which means that the defendant knew that the plaintiff faced a substantial risk of serious harm yet disregarded that risk by failing to take reasonable measures within their authority to address it. *Id.*; *Farmer*, 511 U.S. at 847. It is not enough to allege that a defendant acted negligently or that he or she *should* have been aware of the risk. *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004).

Here, plaintiff claims that (1) urine was seeping into his general population cell from nearby showers; and (2) defendants Ziegler, Roberts and Anderson were involved in a pro forma investigation but then did nothing to fix the problem. This claim may be particularly difficult to prove, but at this early stage, the court must permit plaintiff to try. Indeed, accepting plaintiff's allegations as true, which the court must at this stage of the lawsuit, it is reasonable to infer that all three defendants either turned a blind eye to urine leaking into plaintiff's cell, or they knew about it and refused to take any steps to correct the problem. As such, plaintiff may proceed on an Eight Amendment conditions of

confinement claim against Ziegler, Roberts and Anderson.

## II.    First Amendment

Plaintiff also seeks to proceed on First Amendment retaliation claims arising out of his complaints about the alleged actions discussed above.  To state a claim for retaliation under the First Amendment, Williams must prove that:    (1) he was engaged in a constitutionally protected activity; (2) he suffered a deprivation that would likely deter a person from engaging in that activity in the future; and (3) the protected activity was a motivating factor in defendants' decision to take retaliatory action.  *Bridges v. Gilbert,* 557 F.3d 541, 546 (7th Cir.2009) (citing *Woodruff v. Mason,* 542 F.3d 545, 551 (7th Cir.2008)).  If Williams makes this initial showing, then the burden shifts to defendants to demonstrate that they would have taken the same actions "even in the absence of protected conduct." *Greene v. Doruff,* 660 F.3d 975, 979 (7th Cir.2011).

The first and second elements of this claim are adequately alleged for pleading purposes.  First, plaintiff has a constitutional right to file truthful grievances.  *Watkins v. Kasper,* 599 F.3d 791, 798 (7th Cir. 2010); *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996).  Second, plaintiff has alleged sufficient facts to permit an inference that the denial of adequate care to address his physical and mental health issues would deter a reasonable person in plaintiff's position from filing another lawsuit.

However, the third factor requires analysis of each implicated defendant's motivations.  Plaintiff claims that defendants Fry, Whalen, and Drs. Vickrey and Stange placed him in general population because of his inmate complaints.  He further alleges that:  defendant Whalen also refused to provide plaintiff with medications and took away

his wheelchair because of inmate complaints he filed against her and other CCI staff; defendant Bittleman cancelled his doctor's appointments also in retaliation for his inmate complaints; and defendant Pafford delayed his x-ray because of his inmate complaints. While plaintiff has not alleged that any of these defendants actually said or did anything suggesting that their actions were *motivated* by a desire to punish him, he does allege that each of these defendants took some adverse action against him after learning that plaintiff had filed inmate complaints against them. Thus, the court will permit him to proceed against Fry, Whalen, Vickrey, Stange, Bittleman and Pafford on his First Amendment retaliation claims.

That said, plaintiff should again bear in mind that at summary judgment or trial, he will have to submit concrete evidence of a retaliatory motive to proceed. In particular, the fact that inmate complaints pre-dated the defendants' actions is insufficient proof of retaliation by itself. *See Springer v. Durflinger*, 518 F.3d 479, 485 (7th Cir. 2008) ("[A]s we have stated on many occasions, timing alone is insufficient to establish a genuine issue of material fact to support a retaliation claim.") (internal quotation marks omitted); *Lang v. Ill. Dept. of Children and Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004) ("Close temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is also other evidence that supports the inference of a causal link.").

## IV.  Fourteenth Amendment Equal Protection Clause

Plaintiff next seeks leave to proceed under the Fourteenth Amendment's equal protection clause. The equal protection clause requires the government to treat similarly

situated people alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To establish a prima facie case of discrimination under the equal protection clause, a plaintiff is required to show (1) "that he is a member of a protected class"; (2) "that he is otherwise similarly situated to members of the unprotected class"; and (3) "that he was treated differently from members of the unprotected class." *Brown v Budz*, 398 F.3d 904, 916 (7th Cir. 2005) (quoting *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513 (7th Cir. 1993)). A plaintiff must also plead sufficient facts to show that the defendant "adopted and implemented a policy not for a neutral . . . reason but for the purpose of discriminating on account of race, religion, or national origin." *Ashcroft v. Iqbal*, 556 U.S. 662, 676-77 (2009). In other words, a plaintiff must allege an improper motive, and not merely a discriminatory impact. *See Washington v. Davis*, 426 U.S. 229, 245 (1976).

Here, Dr. Stange allegedly implied that the reason he was moved into the general population was because only white inmates were housed in the special management unit. Accepting that allegation as true for purposes of screening, it is sufficient to permit an inference that there was an inherent discriminatory policy in place that caused plaintiff to be taken out of the special management unit. Accordingly, as Drs. Vickrey, Stange, Woods and Gambaro, as well as Fry and Whalen, each appear to have been involved in the decision to move him out of the special management unit, plaintiff may proceed on a Fourteenth Amendment Equal Protection Clause claim against them.

## V.     ADA/Rehabilitation Act

While plaintiff also claims that defendants violated his rights under the ADA, he will not be allowed to proceed on that claim in this case. The ADA, 42 U.S.C. §§ 12131-

12134, prohibits discrimination against qualified persons with disabilities.   To establish a violation of Title II of the ADA, a plaintiff "must prove that he is a 'qualified individual with a disability,' that he was denied 'the benefits of the services, programs, or activities of a public entity' or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was 'by reason of' his disability."  *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (*citing Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996) (citing 42 U.S.C. § 12132)).   While Congress has abrogated states' Eleventh Amendment sovereign immunity for ADA violations that also constitute federal constitutional violations, the Seventh Circuit has yet to address whether ADA violations that do not implicate constitutional rights may be brought in federal court.  *Norfleet v. Walker,* 684 F.3d 688, 690 (7th Cir. 2012).  Moreover, in circumstances where an ADA claim is questionable and a pro se plaintiff has failed to invoke the roughly parallel provisions of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.,* the Seventh Circuit has suggested reading in a claim under the Rehabilitation Act to avoid this tricky abrogation question.  *Id.*   Accordingly, that is what this court will do here.

The Rehabilitation Act is substantially identical to the ADA; it provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).   A claim under § 504 of the Act has four elements: (1) an individual with a disability; (2) who was otherwise qualified to participate; (3) but who was denied access solely by reason of disability; (4) in a program or activity receiving federal financial

assistance. *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012).

For purposes of the pending screening, the court will assume that plaintiff's various mental and physical ailments render him "disabled" within the meaning of the first element. However, plaintiff's allegations do not satisfy either the second or third elements of the prima facie case. Although CCI is considered a "public entity," plaintiff does not claim to be excluded from any service, program, or activity offered to other prisoners. 42 U.S.C.A. § 12132. Indeed, the Seventh Circuit has already held that refusing to accommodate a prisoner's severe leg spasm condition by installing guardrails on his bed did not implicate the ADA or the Rehabilitation Act, because "incarceration, which requires the provision of a place to sleep, is not a 'program' or 'activity.'" in *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996). *Bryant* also clarifies that this special cell accommodation may constitute medical malpractice, but because the plaintiff in that case was "not complaining of being excluded from some prison service, program, or activity, for example an exercise program that his paraplegia would prevent him from taking part in without some modification of the program," the ADA does not provide any remedy for this lack of services. *Id*. Accordingly, plaintiff may not proceed on a claim under the ADA or the Rehabilitation Act, and defendant Schmidt, CCI's ADA coordinator, will be dismissed from this lawsuit.

## VI.    State Law Negligence/Malpractice Claims

Finally, plaintiff asks that the court exercise supplemental jurisdiction over any negligence or malpractice claims. The exercise of supplemental jurisdiction is appropriate

when the state law claims are "so related" to the federal claims that "they form part of the same case or controversy." 28 U.S.C. § 1367(a). Here, plaintiff's negligence-type claims arise from the defendants' failure to treat him for his various physical and mental health issues. Accordingly, the court will allow him to proceed on his state law claims, but only against certain defendants.

To prevail on a claim for medical malpractice or negligence in Wisconsin, a plaintiff must prove the following four elements: (1) a breach of (2) a duty owed (3) that results in (4) injury or injuries, or damages. *Paul v. Skemp*, 242 Wis. 2d 507, 520, 625 N.W.2d 860, 865 (2001) (*citing Nieuwendorp v. Am. Family Ins. Co.*, 191 Wis. 2d 462, 475, 529 N.W.2d 594 (1995)). Therefore, every claim for medical malpractice and negligence requires a negligent act or omission that causes an injury. *Id.*

Based on plaintiff's allegations, Drs. Vickrey, Stange, Woods, Gambaro, Persike, Norge, Syed, Hoescht and White; Fry; correctional officers Roeher, Knapp and Bittleman; and nurses Newberry, Anderson, Valerius, Whalen, Mashak, DeYoung, Walters and Jessie either ignored his requests for treatment, or provided improper treatment themselves. Accordingly, plaintiff will be permitted to proceed on a negligence claim against each of them.

At the same time, the court declines to exercise supplemental jurisdiction over any negligence and medical malpractice claims against the remaining defendants O'Donovan, Rhode and Warner. In determining whether to decline to exercise supplemental jurisdiction over state law claims, "a district court should consider and weigh the factors of judicial economy, convenience, fairness and comity in deciding whether to exercise

jurisdiction over pendent state-law claims." *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994). As all of the federal claims against these defendants have been dismissed, it would be a waste of judicial resources to require those defendants to respond to state law claims alone.


ORDER

IT IS ORDERED that:

1) Plaintiff Travis Williams is GRANTED leave to proceed on:

   a) Eighth Amendment deliberate indifference and Wisconsin negligence/malpractice claims against defendants Drs. Vickrey, Stange, Woods, Gambaro, Persike, Norge, Syed, Hoescht and White; Fry; nurses Newberry, Anderson, Valerius, Whalen, Mashak, DeYoung, Walters, Thorne and Jessie; correctional officers Roeker, Knapp and Bittelman; and Pafford.

   b) Eighth Amendment conditions of confinement claims against defendants Ziegler, Roberts and secretary Anderson.

   c) First Amendment retaliation claims against Fry, Whalen, Dr. Vickrey, Dr. Stange, Bittelman and Pafford.

   d) Fourteenth Amendment Equal Protection claim against defendants Dr. Vickrey, Dr. Stange, Dr. Woods, Dr. Gambaro, Fry and Whalen.

2) Plaintiff is DENIED leave to proceed on all other claims, and defendants Schmidt, Linda O'Donovan-Alsom, Rhode and Candace Warner are DISMISSED from this case.

3) Pursuant to an informal service agreement between the Wisconsin Department of Justice and this court, copies of plaintiff's complaint and this order are being sent today to the Attorney General for service on the defendants. Under the agreement, the Department of Justice will have 60 days from the date of the Notice of Electronic Filing in this order to answer or otherwise plead to plaintiff's complaint if it accepts service for the defendants.

4) For the time being, plaintiff must send the defendants a copy of every paper or document he files with the court. Once plaintiff has learned what lawyer will be

23

representing the defendants, he should serve the lawyer directly rather than the defendants. The court will disregard any documents submitted by plaintiff unless plaintiff shows on the court's copy that he has sent a copy to the defendants or to defendants' attorney.

5) Plaintiff should keep a copy of all documents for his own files. If plaintiff does not have access to a photocopy machine, he may send out identical handwritten or typed copies of his documents.

6) If plaintiff's address changes while this case is pending, it is his obligation to inform the court of his new address. If he fails to do this and defendants or the court are unable to locate him, his case may be dismissed for failure to prosecute.

Entered this 8th day of June, 2018.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge