IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TRAVIS D. WILLIAMS,

                          Plaintiff,                              OPINION AND ORDER

          v.                                                      16-cv-474-wmc

DR. SALAM SYED, et al.,

                          Defendants.

---

In this case, the court granted *pro se* plaintiff Travis D. Williams leave to proceed on First, Eighth and Fourteenth Amendment claims, as well as state law claims, against 27 officials working at the Wisconsin Department of Corrections' Columbia Correctional Institution ("Columbia"). In particular, plaintiff challenges: the decision not to place him in a unit specified for inmates with mental health conditions, which he claims was racially motivated; decisions denying him access to a wheelchair or medical shoes necessary to address his painful hip, foot and ankle conditions; the treatment of a nose sore; the alleged refusal to prevent him from falling, then failure to treat him after he fell; the failure to address urine leaking into his cell; and the allegedly retaliatory refusal to provide him appropriate medical or mental health care.

Before the court now are the parties' pending cross motions for summary judgment (dkt. ##92, 113), as well as Williams' related motion seeking judgment in his favor and trial related motions (dkt. ##155, 169, 170, 179). After declining to strike his untimely September 11, 2019, filings, the court gave defendants the opportunity to reply to plaintiff's late-filed, summary judgment opposition materials. (Dkt. #184.) Subsequently,

plaintiff also moved to alter or amend the court's June 21, 2021, opinion and order granting defendants' motion for sanctions.  (Dkt. #185.)

In the end, this case is about plaintiff's seeking his own, *preferred* method of treatment for a variety of claimed medical needs, rather than the defendants' recommended treatment.  Regardless, since there is no evidence of defendants acting with deliberate indifference to plaintiff's medical needs, or retaliation for his seeking alternative treatment, they are entitled to summary judgment on the merits of Williams' § 1983 claims.  Thus, the court will award defendants summary judgment, relinquish jurisdiction over his supplemental state law claims, direct the entry of judgment in defendants' favor, and close this case.

## BACKGROUND[1]

Williams was incarcerated at Columbia between May 5, 2015, and April 21, 2017, during which he suffered from several physical ailments, including degenerative joint disease, heel spurs in both feet, fibrosis in his left arm, a hiatal hernia and sleep apnea.[2]

---

[1]  Unless otherwise noted, the facts set forth in this opinion are material and undisputed.  The court has drawn all facts from the parties' proposed findings of fact and supporting evidence, as well as defendants' response to plaintiff's proposed findings of fact.  Much of the evidence on which plaintiff purports to rely in support of his proposed findings of fact is difficult to follow, principally because he does not attest to material events based on his own recollection, but instead cites to documentary evidence using inconsistent citations and designations.  Nonetheless, since most of plaintiff's so-called "evidence" appears to be contained in the attachments to Williams' declaration (dkt. ##96-1, 96-2, 96-3), the court has done its level-best to review those documents and adopted plaintiff's proposed findings of fact insofar as the evidence supports the stated factual findings.

[2]  Plaintiff's Amended Complaint also includes several proposed findings of fact related to his physical ailments while incarcerated at the Racine County Jail in 2013.  (*See* PPFOF (dkt. #94) ¶¶ 17-20.)  He further includes several proposed findings of fact related to treatment received from a physician when he was at Dodge, Dr. Hoftiezer.  (*Id.* ¶¶ 22-24.)  However, these events are not

2

Williams further claims that his left arm was "deformed" after tearing his bicep muscle in half, which required surgery. (Williams Exs. 2, 16 (dkt. #96-3, at 6, 21).) Williams attests that he first started using a cane in 2014, and then in 2015, began using a walker. In April of 2015, while Williams was still incarcerated at Dodge Correctional Institution ("Dodge"), he participated in physical therapy, which included pain interventions like electrical stimulation, hot and cold packs, ultrasounds, and therapeutic exercises using a Thera band. At that time, Williams attests that he was able to walk the farthest he had been able to walk in three years, with the help of a walker.[3]

As for Williams' mental health, he underwent a psychiatric evaluation on April 20, 2015, by a psychiatrist at Dodge, Dr. Drinka. Drinka diagnosed multiple substance abuse disorders, as well as a need to "rule out" schizoaffective disorder and malingering psychosis. (Adams Decl., Ex. 1018 (dkt. #122-1) 161-63.) At that time, Drinka prescribed Williams trazadone 100 mg for 6 months, and ziprasidone 20 mg for 1 week, followed by 40 mg for 6 months.[4]

About two weeks later, on May 5, 2015, Williams was transferred to Columbia. During his intake screening at that facility, the Health Services Unit ("HSU") noted that Williams had the following medical restrictions: use of a walker, use of a wheelchair for

---

material to plaintiff's claims related to events that took place at Columbia starting in 2015, and the court includes those facts here only as necessary to provide context.

[3] At Dodge, Williams also claims a Dr. Karen Miller wrote a medical note stating that he would need a "highly skilled PT" to return him to a functional level, but the document he cites in support of that proposed fact (Ex. 1018 (dkt. #122-1) at 134) includes no such note.

[4] Trazadone is a prescription medication typically used for sleep; and ziprasidone is an antipsychotic medication typically used to treat schizophrenia or bipolar disorder.

distances only, a knee sleeve, arch supports, a blue Thera band, knee high TEDS, and heel cushions. While staff at Dodge had ordered arch supports, heel cushions and a knee sleeve for Williams, those items had not yet arrived at the time Williams was transferred.[5] During the intake screening, HSU also noted that Williams had been prescribed ziprasidone and trazadone by psychiatry, as well as acetaminophen for right knee pain, fiber tabs, and a neti pot for a nose sore. On March 16, 2015, a physician from Dodge had further ordered Williams one tube of bacitracin ointment, with no refills, to treat Williams' nose sore. Essentially from that point until his 2017 transfer out of Columbia, Williams claims that his mental and physical health needs were mismanaged and ignored, prompting him to file this lawsuit on July 1, 2016.

After requiring amendments to his complaint, the court essentially allowed Williams to proceed with claims against the following, *27* current and former Columbia employees: Correctional Officers Douglas Bittelman, Cory Knapp, Joel Roeker and Nathan Roberts; Columbia's warden's Secretary Amber Anderson; Dr. Salam Syed, a physician; Medical Assistant Rachel Pafford; Dr. Philip Hoechst, a physical therapist; Registered Nurses Denise Valerius, Kathleen Whalen, Kerry Newbury, Kristine DeYoung, Jessie Beaver, Melissa Thorne, Neaver Walters and Trisha Anderson; Heath Services Managers ("HSM") Meredith Bird (formerly Meredith Mashak) and Candace Warner; Unit Supervisor Sara Fry; Dr. Daniel Norge, a psychological associate in the Psychological Services Unit ("PSU"); Drs. Maria Gambaro, Julia Persike, Kelsey Stange, Woods, Maureen White and

---

[5] The evidence of record does not indicate precisely when Williams received these items.

4

Raymond Wood, psychologists; and Dr. Robert Vickrey, a psychiatrist. In particular, the court allowed Williams leave to pursue Eighth Amendment claims for deliberate indifference and state law negligence claims against: defendants Bittelman and Warner, for allegedly cancelling certain medical appointments;[6] defendants Drs. Vickrey, Stange, Wood, Gambaro, Fry and Whalen, for denying Williams' access to Columbia's Special Management Unit, and for denying Williams access to mental health treatment; defendants Newbury, T. Anderson, Valerius, Whalen and Mashak, for their handling of Williams' complaints about a nose sore or failing to provide his prescription medications as necessary, leading to an emergency ENT visit; defendants DeYoung, Roeker, Knapp, Pafford, Thorne, Valerius, Anderson, Walters and Beaver, based on allegations related to their handling of Williams' falls; and defendant Warner for delaying a meeting to discuss Williams' health issues, and for ignoring his complaints about testicle pain between March and August of 2016.[7] Williams was also granted leave to pursue a claim of conditions of his confinement against defendants Ziegler, Roberts and Anderson for allegedly failing to take corrective action after learning that urine was leaking into Williams' cell between April

---

[6] The court's initial screening order denied Williams' leave to proceed against Warner, but on reconsideration, the court allowed him to proceed against Warner for allegedly delaying a meeting to discuss his various health conditions and cancelling multiple urology appointments following that meeting. (Dkt. #68, at 1-2.)

[7] For much of this same conduct, Williams also asserts claims under the Fourteenth Amendment equal protection, and state law. In addition, the court granted Williams leave to proceed against Nurses Thorne, Valerius, Anderson, Walters and Beaver for failing to provide medical care following a fall in December 2017, but Williams effectively withdrew this claim by conceding that he was not incarcerated at Columbia at that time.

and July 2016.  Finally, the court granted leave to pursue retaliation claims under the First Amendment against:  defendants Fry, Whalen, Dr. Vickrey and Dr. Stange for placing him in general population because of his inmate complaints; defendant Pafford for delaying his x-ray; defendant Bittelman for cancelling appointments; and defendant Whalen for refusing to provide Williams with medications and taking away his wheelchair because of inmate complaints Williams filed against her and other Columbia staff.[8]

With this context in mind, the court turns to the parties' cross motion for summary judgment here, addressing plaintiff's federal claims, then explaining why the court will relinquish jurisdiction over his remaining state law claims.

## OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment.  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (7th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  When the parties cross-move for summary judgment, the court looks to the burden of proof

---

[8]   While Williams' proposed findings of fact, evidence and arguments go beyond even these expansive claims, he has not sought leave to amend his complaint, despite having already successfully challenged the scope of the court's screening order once.  (Dkt. #68.)  Seeing no basis to infer that Williams may have been confused about the breadth of the claims upon which he *has* received leave to proceed, the court will omit discussion of proposed findings, evidence and argument having no relevance to approved claims.

that each party would bear on an issue at trial, then requires the party with that burden to go beyond the pleadings by affirmatively establishing a genuine issue of material fact. *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). If a party fails to offer evidence permitting the finding of an element essential to his claim or defense, on which that party bears the burden of proof, then entry of summary judgment is appropriate on that claim or defense. *Mid. Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995).

## I.   Eighth Amendment claims against Bittelman, Warner, Ziegler, Roberts and Anderson

Defendants first seek summary judgment on the following claims based on plaintiff's failure to exhaust his administrative remedies: (1) defendant Bittelman's cancellation of several doctor's appointments in 2016; (2) defendant Warner's cancellation of several urology appointments following their July 2016 meeting; and (3) defendants Ziegler, Roberts and Anderson's refusal to correct urine leaking into his cell.

Section 1997e(a) of Title 42 of the U.S. Code states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Generally, a prisoner must also "properly take each step within the administrative process" to comply with § 1997e(a). *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). This includes following instructions for the filing of an initial grievance, *Cannon v. Washington*, 418 F.3d 714, 718 (7th Cir. 2005), and filing all necessary appeals "in the place . . . at the time, [as] the

[institution's] administrative rules require." *Pozo*, 286 F.3d at 1025; *Burrell v. Powers*, 431 F.3d 282, 284-85 (7th Cir. 2005).

This exhaustion requirement is intended to give prison administrators a fair opportunity to resolve grievances without litigation. *Woodford v. Ngo*, 548 U.S. 81, 88-89 (2006); *see also Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013) ("once a prison has received notice of, and an opportunity to correct, a problem, the prisoner has satisfied the purpose of the exhaustion requirement"). If a prisoner fails to exhaust administrative remedies before filing his lawsuit, then the court must dismiss the case. *Perez v. Wisconsin Dept. of Corr.*, 182 F.3d 532, 535 (7th Cir. 1999). Because exhaustion is an affirmative defense, however, *defendants* bear the burden of establishing that Williams failed to exhaust. *Jones v. Bock*, 549 U.S. 199, 216 (2007). Here, defendants have made a *prima facia* showing at summary judgment demonstrating plaintiff's failure to exhaust by virtue of the lack of a specific inmate complaint from each of his claims discussed above (or at least a failure to exhaust his appeal rights). However, the court must address plaintiff's response to that failure before deciding if he has offered some evidence of a remaining disputed issue of fact or law precluding entry of summary judgment in defendants' favor on those claims.

Under the regulations in place in 2016, Wisconsin prisoners were required to start a complaint process by filing an inmate complaint with the institution complaint examiner within 14 days after the occurrence giving rise to the complaint. Wis. Admin. Code § DOC 310.09(6). Moreover, the inmate was allowed to "[c]ontain only one issue per complaint, and must [have] clearly identif[ied] the issue." *Id.* § 310.09(e).

If the institution complaint examiner ("ICE") rejected a grievance for procedural reasons without addressing the merits, an inmate could appeal that rejection. *Id.* § 310.11(6). If the complaint was not rejected on procedural grounds, then the institution examiner must make a recommendation to the reviewing authority as to how the complaint should be resolved. *Id.* § 310.11(6). The offender complaint was then to be decided by the appropriate reviewing authority, whose decision could be appealed by the inmate to a correctional complaint examiner ("corrections examiner") within "10 calendar days." *Id.* §§ 310.12, 310.13.[9] If appealed timely, then the corrections examiner must make a recommendation to the Secretary of the Department of Corrections, whose decision is final. *Id.* §§ 310.13, 310.14.

Plaintiff is proceeding against defendant Bittelman on Eighth Amendment deliberate indifference, First Amendment retaliation and state law claims, all for allegedly cancelling doctor appointments in 2016 without justification. Plaintiff does not dispute his failure to file any inmate complaints against Bittelman based on those alleged cancellations. Instead, he asserts being told in 2016 that filing of an inmate complaint against Bittelman would preclude his transfer out of segregation or to a medium security institution, although he provides *no* details about this claimed exchange. Plaintiff similarly claims that in 2015, Complaint Examiner Linda O'Donovan Alum discouraged him from filing formal complaints, and that he was punished for filing earlier inmate complaints.

---

[9] "Upon good cause, the CCE may accept for review an appeal filed later than 10 days after receipt of the decision." Wis. Admin. Code § DOC 310.13(2).

However, plaintiff neither offers any kind of corroborating evidence for these assertions, much less relate it to any efforts to file an inmate complaint against Bittelman in 2016, nor does he cite to even one conduct report he received for filing inmate complaints. (*See* dkt. #96-3, at 191-203, 197, 198.)  Moreover, plaintiff has submitted no evidence suggesting that he attempted to appeal the rejection of any inmate complaint related to Bittelman cancelling appointments in 2016.  At most, plaintiff includes in his exhibits Interview/Information Requests complaining that Bittelman cancelled appointments in May of 2016 (dkt. #144-1, at 113, 118), but these forms are not part of the ICRS process, and thus, they do not satisfy the exhaustion requirement.  Finally, despite all the other inmate complaints that he regularly filed against DOC employees before, during *and* after this period (discussed in detail below), plaintiff offers no evidence explaining why filing a complaint against Bittelman was somehow different.

As such, there is no *genuine* factual dispute as to whether plaintiff satisfied the exhaustion procedures that were available.  *See Bordelon v. Board of Educ. of the City of Chicago*, 811 F.3d 984, 989 (7th Cir. 2016) ("Rule 56 demands something more specific than the bald assertions of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").  Therefore, summary judgment will be granted on plaintiff's Eighth Amendment deliberate indifference and First Amendment retaliation claims against Bittelman.

Plaintiff is also proceeding on Eighth Amendment deliberate indifference and state law claims against defendant Warner for allegedly cancelling several urology appointments following their July 2016 meeting.  Although plaintiff submitted inmate complaints

regarding urological issues, he did not submit any complaints alleging that Warner cancelled any appointments after the July 2016 meeting.  Rather, plaintiff submitted:  CCI-2016-5626, which was received March 14, 2016, alleging that the HSU did not follow the UW urologists treatment plan for his testicular cysts; CCI-2016-7048, which was received April 1, 2016, alleging he had been denied health care services in March of 2016; CCI-2016-10151, which was received May 17, 2016, alleging that on May 10, 2016, Dr. Syed refused to refer him to a urologist and left the room; and CCI-2016-13387, which was received June 24, 2016, complaining that his meeting with HSU regarding health issues had been cancelled.  Plaintiff claims that he filed *many* inmate complaints that included references to Warner's cancellations, each of which were rejected for raising more than one issue at the same time, and again claims that he was the target of retaliation by prison officials, but he similarly cites no evidence in support (even communications rejecting these complaints on procedural grounds), nor does he specify when he submitted these rejected complaints.  As importantly, he does not even claim to have appealed these rejections.  Finally, plaintiff concedes that none of his accepted and processed complaints raised concern about Warner's actions *after* July 2016.  Accordingly, defendants are entitled to summary judgment with respect to this claim as well.

As for plaintiff's claim against defendants Ziegler, Roberts and Anderson, he did file an inmate complaint raising the issue of urine leaking into his cell in CCI-2016-12740, but failed to appeal timely within 10 days of a reviewing authority's issued decision, as required by Wis. Admin. Code § DOC 310.13(1).  Specifically, on July 25, 2016, ICE Isaac Hart recommended that Williams' inmate complaint be denied because he found that

Columbia's Building and Grounds Manager provided Williams with five, completed work orders regarding the problem. Moreover, on August 4, 2016, the Reviewing Authority, Warden Dittman, accepted Hart's recommendation and dismissed the complaint. Williams later attempted to appeal that decision to the Corrections Complaint Examiner ("CCE") on August 22, 2016, asking that the CCE accept his late appeal because he had been placed in segregation the day he received Dittman's decision, and thus, had been separated from the paperwork he needed to appeal. (*See* Ex. 1017 (dkt. #118-6) 20.) On September 27, 2016, however, CCE Brad Hompe denied Williams' appeal, finding no good cause to accept his untimely appeal. Finally, on October 18, 2016, the Office of the DOC Secretary issued a decision accepting the CCE's recommendation to dismiss the appeal as untimely.

Although plaintiff again claims in response to defendants' motion for summary judgment that the day he received the reviewing authority's dismissal of his complaint he was taken to segregation and separated from his property, no evidence of record suggests that Williams was facing an actual impediment to pursuing a timely appeal, and this court will not second-guess the discretionary decision of the CCE to determine that an untimely appeal is not supported by good cause. *See Clark v. Spittle*, No. 04-C-119-C, 2004 WL 941206, at *1 (W.D. Wis. Apr. 30, 2004) ("[I]t is not this court's role to override the Corrections Complaint Examiner's decision to refrain from finding good cause for the delay and allowing a late appeal pursuant to Wis. Admin. Code § DOC 310.13(2)."). Moreover, since plaintiff's administrative appeal was rejected as untimely, defendants have proven non-exhaustion with respect to this claim as well. *See Conyers v. Abitz*, 416 F.3d 580, 584

(7th Cir. 2005) ("Failure to comply with administrative deadlines dooms the claims except where the institution treats the filing as timely and resolves it on the merits.").

To summarize, defendants are entitled to summary judgment with respect to plaintiff's Eighth and First Amendment claims against defendants Bittelman, and his Eighth Amendment claims against Ziegler, Roberts and Anderson, as well as Warner (at least for alleging cancelling Williams' urology appointments). Although the dismissal of these claims will be without prejudice, it likely will function as being with prejudice, since plaintiff cannot now timely grieve these claims. *See Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002) ("Dismissal for failure to exhaust is without prejudice and so does not bar reinstatement of the suit unless it is too late to exhaust.") (citations omitted).

## II.    Eighth Amendment claims

As for the parties' cross-motions for summary judgment on the merits of plaintiff's remaining Eighth Amendment claims, prisoners have the right to receive adequate medical care, *Estelle v. Gamble*, 429 U.S. 97 (1976), including the right to adequate mental health care. *See Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Rice ex. Rel. Rice v. Correctional Medical Servs.*, 675 F.3d 650, 665 (7th Cir. 2012). To prevail on a claim of constitutionally-inadequate, medical care, an inmate must demonstrate (1) an objectively serious medical condition and (2) a state official who was deliberately (that is, subjectively) indifferent. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). A medical condition is "objectively serious" if it so obviously requires treatment that even a lay-person could recognize the need for medical

13

attention, carries risk of permanent serious impairment if left untreated, results in needless pain and suffering, or significantly affects an individual's daily activities. *Gutierrez v. Peters*, 111 F.3d 1364, 1371-73 (7th Cir. 1997). "Deliberate indifference" means that the official was aware that the prisoner faced a substantial risk of serious harm but disregarded that risk by consciously failing to take reasonable measures to address it. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Thus, deliberate indifference is *more than* negligent acts, or even grossly negligent acts, although it requires something less than *purposeful* acts. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994); *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) ("While evidence of malpractice is not enough for a plaintiff to survive summary judgment on an Eighth Amendment claim, nor is a doctor's claim he did not know any better sufficient to immunize him from liability in every circumstance.").

The threshold for deliberate indifference is met where: (1) "the official knows of and disregards an excessive risk to inmate health or safety"; *or* (2) "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," *and* he or she draws that inference yet deliberately fails to take reasonable steps to avoid it. *Farmer*, 511 U.S. at 837; *see also Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) ("the infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in nature in the criminal sense"). In particular, a jury may "infer deliberate indifference on the basis of a physician's treatment decision [when] th[at] decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Pyles v. Fahim*, 771 F.3d 403,

409 (7th Cir. 2014) ("A prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.'") (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)).

### A.   Mental Health Treatment

As for plaintiff's claims related to his mental health care generally and the specific decision not to place him in the Special Management Unit ("SMU"), defendants seek summary judgment on behalf of:  Drs. Vickrey, Stange, Wood, Gambaro, Persike, and White; Nurse Whalen; and SMU Supervisor Fry.  In doing so, defendants do not argue that Williams' mental health diagnoses did not present a serious medical need, but rather seek summary judgment on the subjective component of deliberate indifference.   In response, Williams asserts that defendants not only continuously failed to respond appropriately to his need for mental health treatment, and even further, conspired with each other to deny him needed mental health treatment and protective placement.  On the record before the court at summary judgment, however, no reasonable fact-finder could infer deliberate indifference.

By way of background, the DOC classifies inmates' mental health needs based on the following system:

- MH-0:  Inmates with no documented mental health needs.
- MH-1:  Inmates with some mental health needs who are not considered mentally ill.
- MH-2A and 2B:  Inmates with one or more psychological disorders that rise to the level of serious mental illness.[10]

---

[10] The distinction between MH-2A and MH-2B is the cause of the disorder, not severity.

Each institution's PSU determines the frequency of clinical contact based on each inmate's classification code.  Plaintiff has never been classified MH-2A or 2B.  So, relevant here, the standard for inmates classified as MH-0 is to make clinical contact only at the inmate's request, and those inmates classified as MH-1 should receive clinical contact at least once every six months.

More generally, inmates at Columbia seeking non-emergency, psychological attention are directed to submit a Psychological Services Request ("PSR") to the PSU.  PSU staff then triage PSR's every weekday and schedule inmates for appointments if the problem requires clinical attention.  If an inmate needs more immediate attention, PSU staff may schedule them to be seen that same day.  Alternatively, inmates dealing with an urgent or emergent psychological issue may alert unit staff, who then contact the PSU.

Additionally, inmates at Columbia with a chronic mental illness or cognitive disorder that renders them vulnerable or unable to function in general population may be placed in the SMU.  During the relevant time, the SMU at Columbia was located on Housing Units 6 and 7, both of which were made up of single cells.  To be placed in an SMU cell, inmates needed a referral from PSU staff *and* approval from the SMU supervisor.

From September 2014 to May 2016, defendant Fry was the Unit Supervisor of Columbia's SMU, and a multi-disciplinary team was assigned to the SMU, including psychologists, medical staff, psychiatrists, social workers, and security and education staff.  During the relevant time, that team met weekly to discuss inmate programming needs and management of SMU inmates.  With that by way of background, the court now turns to

plaintiff's two claims of deliberate indifference to his mental health needs: (1) PSU services and medication; and (2) PSU placement.

## 1. Access to PSU services and medication

When Williams arrived at Columbia on May 5, 2015, staff noted that, except for Dr. Drinka's prescription for trazadone and ziprasidone on April 20, Williams had not received psychiatric treatment or psychotropic medications within the DOC.[11]  Staff also noted that Williams had been assigned a mental health code of MH-1, reflecting his antisocial personality and adjustment disorders, in addition to substance abuse issues. Finally, while it appears that Williams did not receive the trazadone and ziprasidone for approximately two weeks after his arrival, perhaps even after May 21, 2015, the record does not support finding that any of the defendants knew these medications were delayed, much less that they failed to take corrective action in the face of such knowledge.

On June 15, 2015, Williams next met with Dr. Stange for his initial contact session, at which time Dr. Stange noted that he presented with no mental health symptoms or difficulties related to adjustment.  Unfortunately, this notation appears to be based in part on his erroneous impression that Williams had not been prescribed psychotropic medication.  Dr. Stange decreased Williams' mental health code to MH-0, to reflect that he had no mental health needs, while ordering nothing with respect to his existing

---

[11]  Williams purports to dispute this, representing that:  (1) he had also taken psychotropic medication in 1997; and (2) Columbia staff refused to obtain information from an Illinois correctional institution, which would have revealed more details about the severity of his past mental health conditions.  However, he has submitted no evidence that information from Illinois was available to the DOC staff in 2015, when he first arrived at Columbia, nor that he apprised them of it.  Regardless, the staff note is accurate with respect to Williams psychiatric treatment within the *Wisconsin* DOC.

17

prescriptions.  While nothing in the evidence of record explains *why* Dr. Stange failed to note Williams' trazadone and ziprasidone prescriptions, neither does it permit a finding that this failure amounted to more than negligence, nor that Dr. Stange otherwise failed to exercise reasonable medical judgment in concluding that Williams' mental health code should be reduced to MH-0.  Thus, Dr. Stange can be faulted for failing to note these prescriptions, but this omission does *not* support a finding of deliberate indifference, especially since:  no other mental health professionals disagreed with his decision to change Williams' designation to MH-0; *and* Dr. Stange did not actually cancel those medications. At worst, on this record, Dr. Stange's mistaken recitation of Williams' prescribed medications on June 15 amounted to a negligent (or even a grossly negligent) oversight, not deliberate indifference under the Eighth Amendment.  *See Burton*, 805 F.3d at 785 ("Negligence, gross negligence, or even 'recklessness' as that term is used in tort cases, is not enough.") (quoting *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987)).

Moreover, just three weeks later, on July 6, 2015, Dr. Vickrey met with Williams to discuss his medications.  Not only did Dr. Vickrey note Williams' trazadone and ziprasidone prescriptions, but he further decided not to change the prescriptions without coordinating with Williams' psychologist to discuss her impressions and decide on a treatment plan.  Dr. Vickrey also noted a lack of evidence of any thought or psychotic disorder.  In fact, while Williams' reported voices or visions, Dr. Vickrey opined that those symptoms may be attributable to longstanding effects of his use of hallucinogenic drugs, as opposed to a schizophrenic illness.  Although Williams further claims that Dr. Vickrey disregarded his oral representation that he had been diagnosed with mental health issues

as early as 1972, his initial assessment of Williams similarly does not support a reasonable jury's finding of deliberate indifference.  Rather, Dr. Vickrey's note merely indicated his *skepticism* that Williams suffers from a thought or psychotic disorder, even as Vickrey maintained his psychotropic prescriptions and expressed a need to work with PSU staff going forward to determine the most appropriate treatment plan.  If anything, this cautious approach shows appropriate exercise of medical judgment or, at the very worst, a possible, negligent judgment based on a mistaken first impression.

Between this July 6, 2015, meeting and February 2017, the record then indicates that PSU staff met with, or attempted to meet with, Williams on *ten* different occasions: July 27, 2015; November 3, 2015; January 14, May 24, July 1, October 14, October 21, December 1 and December 23, 2016; and February 27, 2017.  In addition, when Williams was held in Restrictive Housing between January and April of 2017, Williams was seen weekly as part of PSU rounds.  (*See* Ex. 1008 (dkt. #115-1) 2.)  Moreover, the records of those subsequent interactions indicate that Dr. Norge, Dr. Gambaro, Dr. Stange and Dr. Persike attempted to engage with Williams, while in large part, Williams refused to discuss symptoms he was experiencing that could be consistent with schizophrenia or psychotic disorder.  Nor did Williams initiate counseling during this period.  Instead, Williams repeatedly expressed to PSU staff his desire for an SMU placement at Columbia or for a transfer to the DOC's Wisconsin Secure Program Facility ("WSPF"), as well as attempted to discuss other, non-psychological issues of a medical nature that he claimed to be experiencing at that time.[12]

---

[12] These medical issues are addressed in detail below.

Effectively having to concede the number of times he was seen by PSU staff, Williams instead seeks to challenge the quality and length of his interactions with PSU staff.  For example, he claims that Dr. Gambaro and Dr. Persike barely assessed him, spent very little time interacting with him, and falsely reported that Williams declined to see them.  Willams also claims that Dr. Persike cancelled scheduled visits with him.  However, Williams does not dispute that the concerns he tried to raise with them were unrelated to his mental health, nor does he direct the court to any instance in which these defendants ignored a *specific* issue Williams raised concerning his *mental* health, much less ignored an *urgent* mental health need that went unaddressed.   Thus, even accepting Williams' assertions that his interactions with the PSU defendants were short-lived (or that Dr. Persike cancelled or rescheduled certain scheduled PSU appointments), a reasonable jury has no basis on this record to infer that Dr. Gambaro or Dr. Persike either ignored or failed to adequately address Williams' mental health needs.

In fact, based on the actual interactions PSU staff contemporaneously reported having with Williams during this general time frame, PSU staff members were coming to an agreement that Williams' mental health needs required neither special placement nor regularly scheduled treatment.[13]   More specifically, on September 4, 2015, Dr. Vickrey wrote that he believed Williams was trying to get himself placed into Columbia's SMU,

---

[13]   Moreover, Dr. Norge attests without contradiction that between 2015 and 2017, "PSU staff consistently found that Williams was not an appropriate candidate" for SMU placement.  (Norge Decl. (dkt. #115) ¶ 21; *see also* Ex. 1008 (dkt. #115-1) 3-13, 15-16.)  And while Williams includes multiple proposed findings of fact related to his request for a single cell (including that defendant DeYoung refused to submit that request to the Special Needs Committee and that he was vulnerable to sexual assault), he is not proceeding on claims related to a need for a single cell because of the risk of assault, nor has he alleged that he was ever assaulted.

but he was not showing evidence of a major mental illness.  Four months later, on January 15, 2016, Dr. Vickrey prepared a Psychiatric Report about Williams, which included an assessment by Dr. Gambaro, who reported on Williams' manipulations to get a single cell and a wheelchair.  (Ex. 1018 (dkt. #122-1) 156.)  Dr. Gambaro in particular believed that: Williams had *no* mental health issues; there was no reason for Williams to be on ziprasidone; and it would be appropriate for Dr. Vickrey to cancel that medication.  Two months after that, on March 11, 2016, Dr. Vickrey came to agree with Dr. Gambaro, opining that Williams' reported symptoms of cognitive impairment was likely malingering in an ongoing attempt to get transferred to the SMU.  (*Id.* at 153-54.)  Specifically, Dr. Vickrey found that:  Williams had trouble answering basic questions and recalling events; and as he continued questioning him, Williams became angry and tacitly threatened him. Based on these interactions, Dr. Vickrey concluded that Williams was feigning confusion -- an opinion that Dr. Gambaro also shared -- noting that Williams' thoughts did not appear disorganized and had not presented with any indicators of a psychotic or bipolar disorder.  Dr. Vickrey wrote further:

> He is taking ziprasidone, which is an antipsychotic medication. I do not believe that he has psychosis or schizophrenia, and Dr. Gambaro does not believe he has this diagnosis either.  It should be further noted that Dr. Kocina and Dr. Stange also do not see him as having evidence of a major psychotic or bipolar disorder, so the consensus among psychiatry and psychology providers is that he does not suffer from schizophrenia or any other psychotic illness.

(*Id.* at 153.)   Finally, Dr. Vickrey discontinued the ziprasidone and trazadone, while prescribing hydroxyzine to help promote sleep.

21

Williams insists these records are improper assessments of the care he received.  In particular, he insists that Dr. Vickrey intentionally sought out other prison officials to conspire to deprive him of his medications, and was lying throughout his evaluation process.  Aside from these conclusory allegations, however, Williams offers *no* evidence to support his position.  Similarly, Williams would challenge Dr. Vickrey's eventual decision to terminate his prescriptions for trazadone and ziprasidone, while ignoring that Dr. Vickrey did not cancel those prescriptions for *eight months*, until after he had collected information about Williams' actual symptoms from other PSU staff members.  To start, even Dr. Drinka had concerns about whether Williams was malingering, specifically noting that condition to be ruled out.  Then, starting in September of 2015, Dr. Gambaro opined that Williams had no mental health issues and that he did not need to take ziprasidone.  Despite skepticism from two other mental health professionals, and Dr. Vickrey's own concerns, Dr. Vickrey did not cancel his medication at that point; instead, he maintained those prescriptions, only concluding six months later, in March of 2016, that it was appropriate to take Williams off ziprasidone.  By that point, Dr. Vickrey had confirmed the initial suspicion that Williams did not have a legitimate mental health need for that medication, a belief corroborated by Dr. Gambaro and Dr. Stange, neither of whom had observed evidence of a psychotic or bipolar disorder.  Even then, Dr. Vickrey provided several legitimate reasons for reaching his own conclusion that psychotropic drugs were not needed, *and* in cancelling the medication, Dr. Vickrey provided Williams an alternative sleep medication (hydroxyzine) as a substitute for the trazadone.  Given this lengthy assessment period and Dr. Vickrey's decision not to leave Williams without *any*

medication, no reasonable fact-finder could fault Dr. Vickrey's decisions on this record, much less conclude that he went so far afield from accepted psychiatric practice to constitute acting with deliberate indifference in violation of the Eighth Amendment.

Williams also claims that Dr. White, the PSU supervisor, lied to him by agreeing to meet with him then refusing to come to his cell. In support, Williams cites a PSR dated January 3, 2017, in which he wrote to Dr. White that PSU staff were ignoring his mental health needs. (Dkt. #96-3, at 99.) However, the record shows that a different PSU staff member (possibly Dr. Norge) responded that they would meet with him soon. (*Id.*) Williams further claims to have complained verbally to Dr. White that PSU staff were meeting with him for just minutes at a time and afterward falsified progress notes to the contrary, but that Drs. White and Norge both refused to see him. However, as of January 2017, there is no dispute that Williams was being held in restrictive housing, where he was being seen at least weekly during PSU rounds. Indeed, the log documenting those rounds indicates that on January 12, a staff member interacted with Williams, noting that he wanted to be transferred to WSPF and was angry with staff. (Ex. 1008 (dkt. #115-1, at 2.) Further, Williams again fails to cite any evidence suggesting that he did not at least have the *opportunity* to interact with PSU staff around this time, much less evidence that Dr. White was aware of, and consciously disregarded, a specific mental health issue that required more PSU contact than Williams was receiving. Even if Dr. White reviewed that PSR and did not visit Williams personally, therefore, that failure by no means supports an inference of deliberate indifference.

Finally, Williams' claim that Dr. Norge ignored his mental health needs is similarly without evidentiary support.  To the contrary, on February 28, 2017, the record shows that Williams met with Dr. Norge for a clinical session.  During their conversation, Williams stated that he wanted to see the unit psychiatrist, and Norge responded that he would follow-up with the unit psychiatrist to see if Williams had submitted a Health Services Request ("HSR"), the form inmates must generally submit when requesting non-urgent medical attention.  Dr. Norge further explains that his normal practice would have been to follow up with the unit psychiatrist about such a request, since he does not have prescribing authority, nor was he involved in delivering or administering medications to inmates.  Rather, only psychiatrists, who are also part of the HSU, are permitted to prescribe psychotropic medications.  Regardless, beyond claiming that Dr. Norge refused to see him in early 2017, Williams does not identify the issue that he needed to discuss with Dr. Norge.  Williams offers *no* evidence that he was subsequently unable to communicate with a psychiatrist, nor that Dr. Norge failed to respond appropriately to his need for mental health treatment that day.  In any event, Dr. Norge attests that he did not perceive Williams to be experiencing a thought disorder or cognitive defect.  As such, there is no basis to infer that Dr. Norge's handling of Williams' mental health condition was problematic or rose to deliberate indifference.

### 2.    Placement in general population

The result is the same with respect to Williams' claims against Drs. Vickrey, Stange, Woods and Gambaro, Unit Manager Fry, and Whalen for refusing to recommend he be

placed on SMU status. Williams maintains that all these defendants were also lying in their assessments of him, and Dr. Stange indicated to him that the actual reason he did not receive SMU status was because he is black. Yet the evidence of record neither permits a reasonable inference of deliberate indifference nor of any other ulterior motive for these defendants' decision to keep the plaintiff in the general population. Therefore, defendants are entitled to summary judgment on Williams' Eighth and Fourteenth Amendment claims related to his placement as well.

Specifically, when Williams initially arrived at Columbia, he was placed in Housing Unit 6, which housed inmates with wheelchairs who were not specifically designated for SMU placement. In July of 2015, Williams submitted information requesting to know if he was classified for SMU placement. Dr. Stange informed Williams that he was living in Housing Unit 6 for mobility purpose only and did not fit SMU criteria. (*See* dkt. #96-3, at 85.) According to Williams, he had a conversation with Dr. Stange about this as well, during which Williams was told that he should "look around" to see why he was not on SMU status at a time when Williams attests that there were only white inmates around them. (Pl. PFOF (dkt. #94) ¶ 134.) Williams also claims that as part of his August 2015 information request, he wrote to Dr. Strange that it was unacceptable for him to not be placed on SMU status because he is black, and Dr. Stange responded that his concern was noted, rather than disagreeing with Williams as to the reason for his placement outside the SMU. (Dkt. #96-3, at 90.) Thus, *Williams* took his interactions with Dr. Strange to mean that only white inmates received SMU placement.

25

Williams further challenges his general population assignment based on his history of mental illness and violence.  In August of 2015, Williams communicated with Dr. Woods about his placement, and Williams claims that Dr. Woods ignored documentation from his criminal case and PSU records related to a mental health condition.  However, the only documentation Williams provides is an unauthenticated page from what appears to be a Presentence Investigation Report ("PSI"), in which the anonymous author acknowledges Williams' self-report of several mental health diagnoses and his being deemed unfit to stand trial in 2005.  (*See* dkt. #96-3, at 195.)  Even setting aside the multiple layers of hearsay in this document, what Williams does *not* explain is how this single page suggests *Dr. Woods* mishandled his status in 2015.  Williams similarly claims that Dr. Vickrey ignored his "violent" history, citing a box on a Health Transfer Summary Form, which was apparently checked by a physician from the DOC's Dodge correctional facility on March 6, 2015, indicating that Williams was "Violent, Aggressive, Angry," without any elaboration or cautionary language regarding an appropriate placement.  (Dkt. #96-1, at 14.)  Nor does Williams suggest that there was a specific recommendation about Williams' placement that Dr. Vickrey ignored.

Even if this dubious information were somehow considered evidence, there is no dispute that the multi-disciplinary team at Columbia agreed after several months of evaluation that Williams no longer needed to live in the SMU, and instead, could receive the same medical services *and* function in a regular housing unit with a cell mate. Therefore, on October 28, 2015, Williams was moved to a general population housing unit.  SMU Supervisor Fry also attests to her assessment that Williams did not need

additional counseling services or access to psychotropic medications delivered in the SMU, since those resources were available to him in any housing unit.  Finally, Fry attests without contradiction that while she was a Unit Supervisor at Columbia, there were several other African American inmates housed in the SMU; in fact, the majority of the inmates in the SMU were African American.

Based on this record, there is no basis to infer deliberate indifference by Drs. Vickrey, Stange, Woods and Gambaro, Unit Manager Fry or Nurse Whalen.  As an initial matter, Whalen, as a nurse, lacked the authority to assign an inmate to *any* housing unit or status, including the SMU or general population, nor is there any evidence that she played any other role in this status decision by others.  *See Minix v. Canarecci*, 597 F.3d 824, 833-34 (7th Cir. 2010) ("[I]ndividual liability under § 1983 requires personal involvement in the alleged constitutional deprivation.").  As for the remaining defendants, Williams has identified no evidence permitting a reasonable jury to find that Drs. Vickrey, Stange, Woods and Gambaro, or Unit Manager Fry handled Williams' status with deliberate indifference.

Finally, plaintiff's theory that he was denied SMU status because of his race is not borne out by evidence.  While he claims to have observed only white inmates in SMU on the day that he spoke with Dr. Stange, plaintiff has no actual evidence confirming his "impression" that a disproportionate number of inmates assigned to SMU were white.  In fact, the *only* non-speculative evidence shows the opposite:  Fry affirmatively attests that between 2014 and 2016, the majority of the inmates in the SMU were African American. Even assuming that Dr. Stange told him to observe the other inmates on that status, which

plaintiff surmised from his observation that only white inmates were in the SMU at that moment meant race was a factor, that evidence alone would not be enough to reasonably find that Williams was assigned to the general population because he is black, particularly absent any other proof that Williams *needed* placement in the SMU and nearly overwhelming evidence to the contrary.

Relatedly, the court concludes that these same defendants are entitled to summary judgment with respect to Williams' Fourteenth Amendment equal protection claim against them.  To succeed on a Fourteenth Amendment equal protection clause claim, plaintiff must prove that the defendants treated him differently than people of another race *and* did so purposefully.  *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000).  The court granted plaintiff leave to proceed on this claim based on this same allegation that defendant Dr. Stange told him to "look around" the SMU to understand why he would not receive that status, and this single statement remains his only "evidence" of racial discrimination. Again, this thin porridge is just too little to speculate, much less reasonably infer, that Williams was being denied SMU status because of his race.

To survive summary judgment, and certainly to be entitled to judgment in his favor on this equal protection claim, plaintiff must come forward with more specific evidence of racial profiling for SMU placement beyond Dr. Stange's ambiguous statement, especially in the face of actual evidence that the majority of the inmates placed in SMU are African American.  *See Parent v. Home Depot U.S.A., Inc.* 694 F.3d 919, 922 (7th Cir. 2012) (summary judgment is appropriate against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that

28

party will bear the burden of proof at trial") (internal quotation mark and citation omitted).  Since he has not met his burden of proof, defendants are entitled to summary judgment with respect to Williams' Fourteenth Amendment equal protection claim as well.

### B.       Other Medical care

The court also granted plaintiff leave to proceed on four challenges to his alleged medical care:  (1) that Dr. Syed and Dr. Hoechst took away or prevented him from accessing medical devices necessary for his mobility (a wheelchair and medical shoes); (2) that defendants Newbury, Anderson, Valerius, Whalen and Mashak ignored or mishandled needed treatment for his nose sore; (3) that defendants DeYoung, Roeker, Knapp, Pafford, Thorne, Valerius, Anderson, Walters and Beaver either caused him to fall or refused to treat him for injuries he suffered after falling; and (4) that Warner delayed a meeting about his health care issues and ignored his complaints about testicle pain between March and August of 2016.  The court will address each claim in turn.

### 1.       Access to a wheelchair and medical shoes

Plaintiff maintains that he is entitled to summary judgment because Drs. Syed and Hoechst outright refused to treat his severe chronic pain and ignored the fact that he was essentially immobile without a wheelchair and medical shoes, due to his hip, foot and ankle conditions.  Defendants seek summary judgment because the undisputed facts prevent a finding that either defendant handled Williams' mobility issues with deliberate

indifference.[14]   On this record, defendants Syed and Hoechst are entitled to summary judgment.

DOC Inmates seeking to obtain a property item or restriction to address a medical issue (including medical shoes or access to a wheelchair) must work with their institution's Special Needs Committee ("Committee").   *See* Bureau of Health Service ("BHS") Policy and Procedure #300:07 (requiring prescribing practitioners to refer their recommended restrictions or property items to the Committee rather than writing orders for specific items).   Thus, physicians like Syed and Hoechst were not allowed to order special needs shoes without Committee approval.   Similarly, other HSU staff may not approve comfort items.   That said, all inmates at Columbia were allowed to buy personal shoes purchased from an approved vendor catalog in accordance with its property rules.

Williams has a long history of heel spurs on both feet and a bunion on his right foot, and at Dodge, he had access to a walker and was allowed access to a wheelchair for distance.  (Ex. 1018 (dkt. #122-1) 4.)  However, on March 27, 2015, when Williams was still at Dodge, the Committee at that institution denied Williams' request for black Velcro shoes, indicating that his condition did not meet the guidelines for special medical shoes. (Ex. 1018 (dkt. #122-1) 968.)   Finally, on April 10, 2015, while Williams was still at

---

[14]  Defendants also argue that Williams did not have a serious medical need requiring a wheelchair. However, in doing so, defendants conflate objective and subjective elements, relying on Syed's and Hoechst's observations and judgment about Williams' mobility, the results of EMG and x-ray images, as well as the judgment of the Special Needs Committee with respect to his need for a wheelchair.  Given Williams' claimed severe pain and difficulty with walking, judgment as a matter of law that he did not have a serious medical need would be inappropriate.  *See Gutierrez*, 111 F.3d at 1371-73 (a medical need is objectively serious if it results in needless pain and suffering or significantly affects an individual's daily activities).

Dodge, Dr. O'Brien, an orthopedic specialist, ordered felt heel pads for Williams' shoes, as well as a physical therapy evaluation for a strengthening regimen and home exercise program, with the hope of transitioning Williams from a walker to a cane.  (Ex. 1018 (dkt. #122-1) 70.)[15]

On May 19, 2015, two weeks after plaintiff's transfer to Columbia, Nurse Whalen responded to an interview request from Williams, inquiring about access to a wheelchair and walker.  Whalen responded by *confirming* that Williams had medical restrictions for a walker, a wheelchair for distance, as well as a knee sleeve.  She further referred him to his unit manager, who would be able to follow up with the property department about Williams' request.

On August 13, 2015, Dr. Syed met with Williams for a hypertension care plan, medication refills and pain issues.  In the contemporaneous notes from this interaction, Dr. Syed expressed doubt as to Williams' need for a wheelchair or walker, and that

---

[15]  Plaintiff also claims that Dr. O'Brien ordered that he use an exercycle twice a week, a knee sleeve and orthotic shoes, but that Drs. Syed and Hoechst failed to prescribe the exercycle, conspired to cancel the knee sleeve and shoe orders, and that Pafford was involved.  However, the three snippets of his medical records that plaintiff cites in support do not show that Dr. O'Brien made these recommendations, nor exactly what Dr. Syed and/or Dr. Hoechst did with these recommendations, much less that any of these "orders" were cancelled.  First, a July 27, 2015, progress note appears to list recommendations from a physical therapist, including a knee sleeve and a "size 12 shoe." (Dkt. #96-1, at 34-35.)  Second, a July 27, 2015, prescriber's orders note refers Williams to physical therapy "to reaffirm PT recommendation, or not."  (*Id.* at 34.)  Third, an information request Williams wrote to then-HSM Mashak complaining that his doctor was ignoring the physical therapist's order for multiple items, including orthotic heel pads.  (Dkt. #96-1 at 18.)  Based on these snippets, Williams also proposes multiple, additional findings of fact that are conclusory in nature and accuse defendants of conspiring to deny him treatment and deprive him of the opportunity to participate in various activities.  (Pl. PFOF (dkt. #94) ¶¶ 73, 74, 79, 81, 86.)  The court has excluded these proposed findings of fact, since Williams is not proceeding on any conspiracy claims, and because the medical records do not support his proposed findings.

Williams became angry and almost attacked him when he tried to discuss walking with Williams.  For his part, plaintiff admits that Dr. Syed questioned whether he should use the wheelchair, but claims he did so without even physically examining him, and that *Dr. Syed* was hostile during the encounter, triggering his own aggression towards Syed. Regardless, Dr. Syed sent a referral to the Columbia Committee for special shoes,[16] as well as a referral to physical therapy to evaluate the need for a wheelchair, walker and knee brace.  Dr. Syed also referred Williams to the PSU to rule out malingering, which Williams claims was retaliatory.

Additionally, on August 14, Dr. Syed ordered an EMG study of Williams' lower right leg at University of Wisconsin ("UW") Health to rule out nerve damage.  (Ex. 1018 (dkt. #122-1) 143-45.)  Williams underwent that study on September 17, 2015, the result of which was normal and did not show any nerve damage.

To the extent plaintiff blames Dr. Syed for his not having access to all his property items for some time after he arrived at Columbia, plaintiff has not shown that Dr. Syed even knew about the delay, nor that he played any role in or had any control over Williams receiving his property items.  Rather, the evidence shows that the *property department* would have received those items and passed them on to Williams once they arrived at the institution.  Likewise, although it appears that at least as of May 19, 2015, Williams may not have had access to his walker or a wheelchair, the evidence of record neither suggests

---

[16]  Williams includes multiple proposed findings of fact related to how other defendants responded to his complaints about footwear.  (Pl. PFOF (dkt. #94) ¶¶ 58-60.)  However, the court did not grant Williams leave to proceed against any other defendant related to his need for special shoes. (*See* dkt. #30, at 13.)

Dr. Syed was responsible for this delay nor had reason to know that Williams lacked access to these items. In fact, the evidence shows that Williams' first meeting with Dr. Syed took place three months later, at which point Williams had access to both items.

As for Dr. Syed's handling of Williams' foot problems and mobility, even accepting that Dr. Syed expressed doubt as to Williams' need of a wheelchair and that Dr. Syed displayed hostility towards Williams, a poor attitude or hostility towards Williams alone does not support an inference of deliberate indifference. *See DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000) (verbal harassment standing alone does not amount to a constitutional violation). What is material for purposes of plaintiff's claim against Dr. Syed are his *actions*, and as outlined above, there is no genuine dispute that Dr. Syed arranged for several interventions to address Williams' pain and mobility, including referral to the Committee for special shoes, a referral to physical therapy for further evaluation of his need for a wheelchair, walker and knee brace, and a PSU referral out of concern that Williams might be malingering. Dr. Syed also ordered the EMG study, which effectively ruled out nerve damage in his lower right leg.

Thus, Dr. Syed did *not* take away Williams' access to any devices to assist him in walking, but rather decided that further evaluation was necessary. These judgment calls do not suggest deliberate indifference, and in fact, generally agree with Dr. O'Brien's original assessment from April of 2015, including supporting the issuance of special shoes. Although the Committee denied Williams requests for a wheelchair restriction and special shoes on December 3, 2015, the evidence neither suggests that Dr. Syed was responsible for either denial, nor that he had the authority to override the Committee's decision.

Moreover, despite those denials, Williams retained the ability to wear personal shoes for all purposes except visits and on offsite trips, *and* he still had access to his walker.

Similarly, Dr. Syed's subsequent handling of Williams' foot condition does not support a finding of deliberate indifference. On August 17, 2015, Williams was evaluated by nursing staff for shoes, consistent with Dr. Syed's order. On October 22, 2015, when Williams was experiencing pain due to the cold weather and an apparent leg injury, Nurse Whalen saw Williams to assess his feet, advising him to stick with physical therapy, ibuprofen and Tylenol, and to use his walker as much as possible to maintain leg muscles. While Dr. Syed subsequently met with Williams multiple times for foot pain over the next two years, Williams continued to have access to his walker, as well as other interventions to address his foot pain, including ice therapy, activity restrictions, ace wrap, ibuprofen, Tylenol, muscle rub and general education about PRICE measures (protect, rest, ice, compression and elevation). In addition, Williams received: (1) orthotic inserts for arch supports and heel cushions; (2) new orthotics on December 11, 2015; (3) soft Velcro shoes on February 15, 2016, by order of Dr. Syed,[17] as well as a refitting for those shoes on July 14, 2016; and (4) replacement orthotics slightly over a year later, in April of 2017, after he was transferred to WSPF. Moreover, plaintiff has submitted no evidence permitting a

---

[17] Plaintiff claims Nurse Valerius, not Dr. Syed, ordered him soft Velcro shoes, but the evidence he cites in support -- two information requests that he submitted about the shoes and a progress note showing that Valerius ultimately signed the order for Williams to receive the shoes (*see* dkt. #96-3, at 41-43, dkt. #96-1, at 39) -- does not create a genuine dispute of fact regarding who originally directed the shoes be ordered.

reasonable jury to infer that Dr. Syed had a legitimate reason to believe that these interventions were insufficient to address his heel spurs and bunion.

Finally, the evidence of record contradicts plaintiff's assertion that Williams' pain went unaddressed. From December 28, 2015, to January 11, 2016, and again from March 22, 2016, to September 15, 2016, Williams had a medical restriction for ice four times a day as needed. From January 12 to April 11 and April 16 to April 30, 2017, Williams was also allowed to use ice, up to three times a day as needed. Additionally, HSU nurses were authorized to provide further pain relief in accordance with nursing protocols. For plaintiff's acute foot pain in particular, these approved measures included ice therapy, activity restriction, ACE wrap, ibuprofen, Tylenol, muscle rub and education on PRICE measures. While plaintiff questions the quality of the care he received, the record does not support a finding that Dr. Syed prevented him from accessing these treatment interventions or otherwise failed to exercise medical judgment in treating his heel spurs and bunion.[18]

In his role as a physical therapist, Dr. Hoechst is also entitled to summary judgment. Hoechst first met with Williams on July 6, 2015, for a physical therapy evaluation, as a continuation of the physical therapy Williams had started at Dodge. Observing that Williams arrived at the appointment in a wheelchair but able to independently transfer onto the exam table, Dr. Hoechst noted that Williams presented with bilateral knee pain,

---

[18]   Williams also includes proposed findings of fact related to Nurse Newbury's response to his complaint about his feet swelling at night (Pl. PFOF (dkt. #94) ¶ 66), which the court excludes because he is not proceeding against defendant Newbury with respect to how she handled his foot pain complaints.

reported 10 out of 10 pain in his knees, as well as pain in his ankles, heels, feet and hips. At the same time, Dr. Hoechst noted that Williams' performance and participation in muscle testing that day was inconsistent, and he did not participate in some of the exam, including a single-leg balance test.  For his part, plaintiff claims that he simply could not do what Dr. Hoechst was asking, despite Hoechst screaming at him.  Plaintiff further claims that he told Dr. Hoechst that his physical therapy plan in place at Dodge had been working, and he had been able to use his walker up to one mile, but needed the wheelchair for longer distances.  Williams also asked for a Thera band for strengthening exercises but claims Dr. Hoechst would not authorize it.

Still, the evidence shows that Dr. Hoechst attempted to prescribe Williams a Home Exercise Program ("HEP"), recommending a supine straight leg raise to improve quadriceps strength and supine bridges to improve hamstring strength, but that Williams refused to try those exercises.  Even as plaintiff paints the evidence at summary judgment, he was lobbing to obtain medical devices, rather than participating in the exercises Dr. Hoechst recommended to increase mobility.  Moreover, because of Williams' unwillingness to participate in the evaluation process or the prescribed HEP, Dr. Hoechst initially decided not to schedule Williams for more appointments.  While Williams disagreed with Hoechst, he has shown no more than that -- a disagreement on treatment, not deliberate indifference.

So, too, when Dr. Syed referred Williams back to Dr. Hoechst the following month. Dr. Hoechst noted that Williams arrived with a list of items that he wanted, including heel pads, electrical stimulation and inserts.  And when Dr. Hoechst told Williams that the purpose of the appointment was for him to *evaluate* Williams' gait, Williams responded, "I

36

don't agree with your methods, you're incompetent and if you take my wheelchair, you guys won't like my conduct."  (Hoechst Decl. (dkt. #123) ¶ 9; Ex. 1018 (dkt. #122-1) 127-28.)  Because Williams would again not participate in the evaluation, Dr. Hoechst terminated the visit, noting that he was unable to make any recommendations.

At the end of 2015, Williams was again referred to physical therapy on December 4, 2015, at which point he agreed to comply with the Hoechst's prescribed exercise program following assessment.  Specifically, Dr. Hoechst noted that Williams presented with vague complaints of "full body muscle loss," and pain in his hip, toe and foot. Although Williams reported his pain as a 10 out of 10, and claimed numerous past injuries, including a bicep injury, gunshot wound and stabbing injury, Dr. Hoechst was unable to find a record of those injuries in his medical chart.  Williams also complained of muscle mass shrinking due to an illness HSU did not "care about."  (Ex. 1018 (dkt. #122-1) 125-26.)  Dr. Hoechst further noted that Williams had again ambulated to HSU using a walker, which he reported using for four years before his incarceration.  Dr. Hoechst also observed that Williams' gait was slow, with poor technique and that he often did not put weight on his left lower leg.  However, Dr. Hoechst noted that Williams demonstrated inconsistent and self-limiting behaviors during manual muscle testing, and he refused to allow Dr. Hoechst to conduct additional special tests on his hip.  (Williams maintains that he was simply incapable of performing them.)   Still, to rule out arthritis in his right hip, Dr. Hoechst wrote an order to image that hip[19] and issued a new HEP to increase leg strength,

---

[19]  In ordering this new imaging, Dr. Hoechst also noted that Williams' EMG study from September 17, 2015, conducted at University of Wisconsin ("UW") Health, as ordered by Dr. Syed, was

concluding that using a walker to ambulate was a safe and effective way for Williams to build strength in his legs, rather than sitting in a wheelchair.  When Williams asked if he could have access to a wheelchair to attend recreation, Dr. Hoechst felt it was not appropriate, reasoning that Williams should instead start by performing HEP in his cell.

On December 11, 2015, Dr. Hoechst had yet another appointment with Williams, observing his use of a walker in a slow and safe matter.  While Dr. Hoechst issued Williams a right knee sleeve and new orthotics, he again declined to change Williams' assistive devices, including the request for a wheelchair, observing that the x-ray of Williams' hip had come back negative.  A month later, Dr. Hoechst met with Williams for pain in his left shoulder, right hip, right hand, bilateral feet and back pain.  Dr. Hoechst noted that Williams:  could not explain when his leg or back symptoms started; had reduced muscle strength in his left lower extremity versus right; gave poor effort during the exam; and reported he was not completing the HEP and not participating in clinic exercises.  Dr. Hoechst further noted that Williams was still able to ambulate with use of his walker.  Based on the imaging and his clinical tests, as well as his observations, Dr. Hoechst once again decided that Williams should continue using the walker.  In his declaration at summary judgment, Dr. Hoechst similarly opines that a wheelchair would not have been a wise long-term strategy, since it could lead to further degradation of muscle strength, immobility and inactivity, which carry serious, long-term health impacts outweighing any benefits from the use of a wheelchair.  When Dr. Hoechst told Williams he would not

---

normal and it did not indicate any nerve damage. (Ex. 1018 (dkt. #122-1) 125-26; Hoechst Decl. (dkt. #123) ¶ 10.)

approve a wheelchair, Williams threatened legal action and was discharged from Dr. Hoechst's care after this visit.

Even viewing all this evidence in plaintiff's favor, including his report of severe pain, no reasonable fact-finder could infer that Dr. Hoechst was not exercising medical judgment during his interactions with Williams. Like Syed, Hoechst expressed skepticism about Williams' need for a wheelchair after first examining Williams on July 6, 2015, based on Williams' ability to move from the wheelchair to the exam table, his inconsistent performance of tests, and his refusal to participate in other portions of the exam. Whether this skepticism was wholly justified, no reasonable trier of fact could find that Dr. Hoechst lacked a medical basis to conclude that Williams was more focused on obtaining medical devices than engaging in physical therapy exercises, nor that Hoechst had a medical basis not to schedule further appointments with Williams at that point, since Williams had refused to be fully evaluated and declined to participate in the HEP Hoechst felt would help strengthen his leg muscles and enable him to walk. *See Walkers v. Peters*, 233 F.3d 494, 500 (7th Cir. 2000) (no deliberate indifference when inmate refused to take a preliminary test before beginning treatment). Worse, Williams appeared to have made an implicit threat against Dr. Hoechst during their August 17 interaction, further lending credence to Dr. Hoechst's opinion that engaging in physical therapy would be futile. Moreover, the evidence shows that when Williams' attitude changed somewhat in December 2015, Dr. Hoechst responded appropriately, issuing him a right knee sleeve and orthotics, providing him the HEPs previously discussed *and* ordering an image of his left hip to rule out arthritis. Dr. Hoechst took all these steps *despite* evidence that Williams

was malingering. As with Dr. Syed, plaintiff has produced no evidence permitting a reasonable jury to find that Dr. Hoechst acted with deliberate indifference, considering his ongoing treatment of Williams for his mobility-related issues.[20]

Regardless, it is undisputed that Williams had access to a wheelchair for purposes of distance up until the Committee's December 3 denial, and that he always had access to his walker, ice, over-the-counter medications and personal shoes for most purposes. Plus, it is undisputed that defendants Syed and Hoechst were never members of the Committee that made decisions on a wheelchair or special footwear, and while both defendants were able to recommend to the Committee that Williams have wheelchair access, it was not deliberate indifference for them to decline to do so. Ultimately, plaintiff's claims against Syed and Hoechst are based solely on his having past access to a wheelchair and his belief that he needed a wheelchair going forward, neither of which supports a finding of deliberate indifference by either defendant. *See Sistrunk v. Khan*, 931 F. Supp. 3d 849, 857 (E.D. Wis. Jan. 24, 2013) (prisoner's perception that he needed a wheelchair was insufficient to call into question the decision not to provide him one). Even Williams' claim of related, ongoing pain is a matter of dispute over the adequacy of the relief provided, not proof of deliberate indifference to his claims of pain.

---

[20] Similarly, defendants have established that there was no reason to believe Williams was suffering from a nerve or arthritis-related condition, and that Williams' medical records do not confirm the history of gunshot wounds Williams claimed, nor more importantly, any serious consequences of such an injury.

2.    **Nose sore**

Next defendants seek summary judgment on Williams' claims that Nurses Newbury, Anderson, Valerius, Whalen and Mashak either ignored his complaints about or failed to provide him with a prescription for his nose sore as necessary in 2015, arguing that their responses to his need for treatment did not amount to deliberate indifference. Williams also seeks judgment in his favor on these claims because, in his view, these nurses continually mishandled his need for his medication and recommended wholly inappropriate treatments, such as icing his nose, which led to an emergency ENT visit. For the reasons explained below, the record does not support a finding of deliberate indifference against these nurse defendants either.

Plaintiff's principal claim about the nurses' handling of his nose sore concerns his inability to obtain prescription medications in a timely manner. When an inmate submits a medication refill form, it is forwarded to the Medication Room, where staff pull the medications, label them, and place them in a bag to be delivered to the appropriate housing units. Importantly, there is no dispute that nursing staff lack the authority to change orders, write prescriptions, or refer inmates to outside specialists. Therefore, if an order has expired, then nursing staff must wait for an advanced care provider to issue a new prescription before issuing the medication or order a refill.

Defendants do not dispute that plaintiff did not receive access to many of the items he was using to treat his nose sore for approximately two weeks following his May 5, 2015, transfer to Columbia. However, the record shows that on May 19, he received Sinucleanse packets for his neti pot, as well as bacitracin ointment, then on May 21, refills of

41

acetaminophen, ziprasidone and trazadone were also sent to his unit at Columbia.[21]

Whether or not these delays presented a serious medical need that had gone unaddressed, the problem with plaintiff's proof is a complete lack of evidence that any of the nurse defendants knew about these delays and failed to take any corrective action. More specifically, plaintiff claims that defendant T. Anderson ignored his request for nose medications, while citing only to an HSR with a receipt stamp of May 10, 2015, complaining that he did not have his ointment, walker, neti pot, heel pads, fiber pills and psych meds. (Dkt. #96-3, at 12.)  The record shows T. Anderson responded to that HSR on May 26, 2015, writing that:  his walker and wheelchair restrictions were current; his walker was on his unit; his medications were sent on May 21, 2015, and his antibiotic ointment had expired.  Plaintiff has not submitted evidence suggesting that any of T. Anderson's observations by May 26 were incorrect, nor that she received the HSR before May 26, much less what additional steps she should have taken, if any, to have the expired bacitracin ointment refilled sooner.  Indeed, by the time defendant Anderson responded, the evidence shows plaintiff was already in receipt of the ointment.  Finally, to the extent Anderson might somehow be faulted for failing to take additional steps to request a refill, no more than a finding of negligence is conceivable from a reasonable jury, but certainly not deliberate indifference, especially absent evidence suggesting that Anderson even knew that Williams *needed* a refill.  *See Burton*, 805 F.3d at 785.

Williams also charges Nurse Pafford with refusing to provide him bacitracin

---

[21] Plaintiff represents that he did not actually receive the refills until May 26 because he was at the Kenosha County Jail on May 21, but if so, this is no fault of the nurse defendants at Columbia.

ointment, citing his information request dated June 11, 2015, complaining that he had been told his bacitracin prescription had expired.  However, Williams' own medication profile shows that he received refills for bacitracin on June 2 *and* June 15, 2015.  (Ex. 1018 (dkt. #122-1) 215.)  Moreover, Pafford responded to Williams on June 15 explaining that he had one refill for bacitracin left, *and* Williams received that refill the same day.  (Dkt. #96-1, at 16.)  Accordingly, plaintiff's cited evidence does not support a finding that Pafford refused to fill a prescription for him, but instead indicates that she took steps to *ensure* he received the ointment.

Plaintiff next claims that he did not receive another bacitracin refill until August, but once again provides no evidence suggesting any of the nurse defendants knew he needed a refill and consciously disregarded that need.  To the contrary,  Dr. Syed met with Williams on August 13, 2015, and they discussed his various health issues.  With respect to his nose sore, Syed prescribed Williams hydrocerin, a prescription moisturizing cream, and Williams received that medication on August 19.  Williams also submitted several interview/information requests, to which Nurse Whalen responded on August 18, 2015. Specifically, Whalen noted that Williams' medical concerns were all addressed during his August 13 appointment, and that there were no follow-up appointments, since the doctor who examined Williams had not ordered a follow-up appointment.  However, Whalen also noted that although ibuprofen had been ordered for Williams, ointment had mistakenly not been ordered.  Again, this response does not support a finding of deliberate indifference by defendant Whalen, but rather her appropriate efforts to respond directly to Williams' concerns by noting that the ointment had not been ordered, taking corrective action, and

ensuring his receiving that ointment the next day.

None of the subsequent care provided by defendants for Williams' nose sore suggests deliberate indifference either. On October 6, 2015, Dr. Syed wrote a new order that Williams apply a cleanser for his nose sore (Betasept), as needed for three months. Williams received that medication on October 6, 2015, November 30, December 13, December 27, and January 6, 2016.[22] Then, on January 13, 2016, Dr. Syed submitted a request for an offsite evaluation of Williams' nasal septal perforation and ulceration, which was approved that same day. Williams was scheduled for an appointment less than a month later.

On February 11, 2016, Williams had an appointment at UW Health Otolaryngology ("ENT"). The record of that visit also does not suggest his nose sore had been handled with deliberate indifference. Rather, the ENT cauterized Williams' perforation in the sore and recommended an antibiotic and Bactroban without noting his condition was severe or an emergency. Moreover, upon his return from that appointment, Nurse Venya noted the offsite physician's recommendation that Williams receive Keflex 500 mg and Bactroban ointment, which plaintiff claims defendants Newbury, Syed, Warner, Whalen and DeYoung subsequently mishandled because he did not actually receive the Bactroban that had been prescribed. Yet there is no dispute that HSU staff *attempted* to fill Williams' prescription for him and were unsuccessful through no fault of any defendant in this lawsuit. Williams' records show that Dr. Syed signed off on the

---

[22] Williams claims that he received bacitracin rather than Betasept in November of 2016, but this, too, is evidence of no more than negligence.

orders on February 12, and Nurse Whalen transcribed the orders that same date.  (Ex. 1018 (dkt. #122-1) 63.)  Whalen then immediately provided Williams the Keflex but had to order the Bactroban from the DOC's Central Pharmacy because Columbia did not carry it.  (*Id.* at 210; Whalen Decl. (dkt. #114) ¶ 23.)

Within a few weeks, Williams started inquiring about the missing Bactroban ointment, and on March 5, DeYoung responded that the institution was waiting for the medication to arrive.  On March 21, Nurse Newbury further responded to Williams' formal HSR, noting that the Bactroban was also not available through the Central Pharmacy because it was a non-formulary medication (meaning that it was not a drug approved by the DOC).  Even then, Dr. Syed verbally authorized Newbury to provide him bacitracin that same day, which Newbury did.  Nurse Whalen further explains that the Bactroban ointment may have required pre-approval from the Medical Director, which would explain why Dr. Syed's order for that medication had not been filled.  Finally, Whalen attests without contradiction that *nursing staff* are not involved in decisions related to drugs not on the DOC's list of approved drugs, and she was unaware that Williams did not actually receive the Bactroban after she initiated the order.  Thus, even viewed in a light most favorable to plaintiff, this evidence would support no more than a finding of negligence against any of the nurse defendants.

Moreover, on March 29, 2016, Dr. Syed met with Williams and wrote a *new* order for Williams to apply Betasept to his sore nose daily, as needed for six weeks.  Dr. Syed met with Williams again six weeks later, on May 12, noting that Williams would be

scheduled for a follow-up with an ENT.[23]

Defendants have also offered proof that on August 1, 2016, and November 10, 2016, an UW ENT again met with Williams off-site to address his sore nose, and contrary to plaintiff's claim, the ENT noted that Williams' nose had actually *improved*, compared to the February appointment.  Specifically, the specialist noted "a nasal septal erosion [which] can be a chronic condition despite treatment. . . . [and] did not recommend repeat nasal cautery since there is not significant excoriation of the nasal mucosa."  (Ex. 1018 (dkt. #122-1) 94.)   Accordingly, the specialist simply recommended Williams take an oral antibiotic for ten days and a topical antibiotic for 30 days.  (*Id.*)

Back at Columbia, a non-defendant, Dr. Springs, signed off on the specialist's recommendations, and on November 10, 2016, Williams received Cephalaxin and bacitracin/polymyxin consistent with those recommendations.  Despite the screening labs conducted at UW ENT coming back within normal limits, Williams was seen for a follow-up at UW ENT on March 9, 2017, when his sore nose was treated with silver nitrate.  At that point, the specialist merely recommended that Williams use over-the-counter nasal spray or room humidification and triple antibiotic ointment for one week.  The specialist also noted that no follow-up was needed unless his symptoms progressed.  Dr. Springs then signed off on the specialist's recommendations, and that same day, Williams received triple antibiotic ointment and nasal spray.[24]

---

[23] Although Dr. Syed wrote that Williams' nose was "clear," and plaintiff claims that his nose was bleeding, at least in the context of defendants' undisputed ongoing care for his nose, this is insufficient to support a finding of deliberate indifference.

[24] Plaintiff claims that he was in pain after this procedure, and given only one 800 mg tablet of

Although the record of Williams' access to his prescribed nose sore medication certainly includes a few delays between when he ran out of his bacitracin and when he received a new tube, plaintiff has offered no evidence that any of the named defendants were responsible for those delays.   Furthermore, as discussed, the totality of the care Williams received for his nose sore does not support a finding of deliberate indifference. *See Budd v. Motley*, 711 F.3d 840, 844 (7th Cir. 2013) (while plaintiff was dissatisfied with his medical care, deliberate indifference claims were properly dismissed because the record established that he had "received medical attention, medication, testing and ongoing observation"); *Stewart v. Wall*, 688 F. App'x 390, 394 (7th Cir. 2017) (delays in receiving medical equipment necessary for treatment did not support a finding of deliberate indifference, since defendants could not control the delay).   Finally, even to the extent that plaintiff would fault the nurse defendants, absent evidence that they knew the ibuprofen would be ineffective, the nurse defendants were entitled to defer to judgment of the physicians with respect to the recommended pain relief.   *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1075-76 (7th Cir. 2012) (nurse is entitled to rely on a doctor's instruction unless it's obvious that the doctor's advice will harm the prisoner).

Thus, even assuming that there were some initial gaps in Williams' access to bacitracin, and then that the HSU was unable to get the prescribed Baclofen, Williams was *consistently* receiving attention from HSU staff to address his chronic nose sore, the treatment of which involved three different off-site visits, none of which were urgent or

---

ibuprofen, which was ineffective, but this does not change the lack of evidence of deliberate indifference by any named defendants.

required intensive follow-up treatment.  Accordingly, there is no basis to find that any of the nurse defendants handled his nose sore with deliberate indifference.

### 3.    Falls

Next, the court turns to plaintiff's fall-related claims against defendants DeYoung, Roeker, Knapp, Pafford, Thorne, Valerius, Anderson, Walters and Beaver.  Specifically, plaintiff alleges that:

- In September of 2015, Nurse DeYoung refused to treat Williams when he went to the HSU after he fell;

- On October 3, 2016, Officers Roeker and Knapp failed to follow protocol in transporting him to a conduct report hearing, causing him to trip and injuring his arms, wrists, hip and back;

- In October 2016, Medical Assistant Pafford delayed an x-ray for six months; and

- In December 2016, Nurses Thorne, Valerius, Anderson, Walters and Beaver failed to provide medical care following a fall.

The court will address the actual evidence as to each of these allegations in turn.

First, although plaintiff alleges in his amended complaint that Nurse DeYoung did nothing (beyond checking his vitals) after his September 2015 fall, as well as refused to treat him for a self-inflicted hand injury, he offers no details about the actual nature or extent of his injuries when presenting to DeYoung, nor about his actual interactions with DeYoung.  Similarly, there is little other evidence related to his alleged hand injury except for Williams' October 1, 2015, HSR, complaining of a painful hand injury, to which Nurse Valerius responded on October 3, 2015, indicating that a sick call appointment would be

48

scheduled.  However, a contemporaneous medical note from Nurse Anderson indicates that Williams then refused to be seen for a scheduled sick call on October 5, *and* Williams signed a Refusal of Recommended Health Care form.  While plaintiff now asserts his refusal to be seen was the result of his having no funds to cover a co-pay to be seen that day, this is certainly not evidence that DeYoung refused to treat him for an injury.  Indeed, since plaintiff neither directs the court to any documented interaction between DeYoung and him during this period, much less provide details about his actual medical need or the circumstances surrounding her alleged refusals to treat him for an injury, she is entitled to summary judgment.  *See Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021) ("Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.") (internal citation and quotation marks omitted).

Second, almost a year later, on October 6, 2016, Nurse Valerius also received an HSR from Williams, complaining that Nurse Thorne had failed to treat his injuries following an October 3 fall over his walker.  Valerius responded by indicating that his request would be forwarded to the HSM.  Plaintiff now appears to claim this fall was precipitated by Officers Roeker and Knapp requiring him wear leg restraints while using his walker during a transport.  However, the limited evidence surrounding this fall does *not* support a finding that either officer acted with deliberate indifference to the risk that Williams would fall.  While alleging in his amended complaint that Roeker and Knapp failed to follow protocol, and then laughed when he fell, plaintiff directs the court to no policies that these officers violated, nor does he even claim to have warned them that he

49

was feeling unsteady and would fall if required to travel with restraints.  Plaintiff also offers no evidence suggesting that either defendant required him to walk, go down stairs or maneuver himself in any manner that would appear to put himself at an obvious risk of a fall.

Instead, plaintiff cites to the incident report created after the fall, which contains no suggestion of any wrongdoing by Roeker or Knapp -- either in requiring Williams to be shackled during transport or in responding to his need for medical attention after his fall. (*See* dkt. #96-2, at 1-3.)  Moreover, although plaintiff claims that he was injured by the fall, he *also* affirmatively alleges in his amended complaint that these defendants called medical staff on his behalf, and that Nurse Thorne looked at his injuries and agreed to send him ice and order ibuprofen.  Although plaintiff claims that he never received the pain relief items that Thorne had promised, he has neither alleged facts nor, more importantly at summary judgment, offered evidence from which a reasonable jury could infer an obvious risk that Williams would fall.  Roeker and Knapp are entitled to summary judgment as well.

Third, as for Williams' claim against Medical Assistant Pafford, the evidence does not support a finding that she was even aware of an x-ray order for which she was responsible, much less failed to schedule one timely.  In fact, an order was *not* placed for an x-ray of Williams' hand until the end of October 2016, after a non-defendant, advanced care provider Janice Waldstein, met with him about his complaints of right hand and shoulder pain.  Williams then underwent x-rays of his right hand and shoulder the day after his second visit on November 22, 2016, which showed no facture, dislocation or

abnormalities.[25]  This timeline not only suggests that defendant Pafford played no role in delaying an x-ray order, but further that *no* order for an x-ray was delayed, as well as calls into question whether Williams even presented with a serious medical need.  Regardless, Pafford, too, is entitled to summary judgment on this claim.

Fourth, plaintiff claims that Nurse Walters did not treat his injuries from a 2016 fall down some stairs.  However, plaintiff only cites medical records of an interaction between defendant Walters and Williams from November 4, 2016, in which Walters provided Williams an ice pack and muscle rub for complaints about stomach pain and ongoing chronic pain.  (*See* dkt. #96-1 at 62-63.)  This evidence does not suggest that Walters refused to treat any fall-related injuries, much less allow a reasonable jury to find she acted with deliberate indifference, and Williams has submitted no other evidence that he even complained about a fall to Walters or that she refused him treatment during such an interaction.  Plaintiff similarly claims that Nurse Beaver refused to treat him for his injuries from the October 2016 fall, but again does not attest to when they interacted or what specifically he reported to Beaver.  Thus, both defendants Walters and Beaver are also entitled to summary judgment.

---

[25] Williams claims the radiology company conspired with the institution to return a normal report, maintaining that his foot spurs were not normal and that he had other diagnoses, including a testicular cyst and degenerative joint disease in his knee (*see* dkt. #96-5, at 186), suggesting that this November 22, 2016, x-ray was not normal.  Williams also points to a July 3, 2017, x-ray report related to his shoulder that showed mild degenerative joint disease of the left and right shoulders. (*Id.* at 187.)  Williams' conspiracy claim is wholly unsupported, and evidence that he was diagnosed with mild degenerative joint disease over seven months later does not suggest that the x-ray in November of 2016 was abnormal.

Fifth and finally, plaintiff claims that defendants Thorne, Valerius, Anderson, Walters and Beaver all acted with deliberate indifference to his serious medical need arising out of his December 2016 fall.  Medical records do show that on December 8, 2016, Williams reported a fall to a nurse doing her rounds, who only noted a skin tear on his elbow, but no other signs or symptoms of an injury.  (Ex. 1018 (dkt. #122-1) 199.)  Moreover, plaintiff's proposed findings of fact do not direct the court to any records memorializing his efforts to receive treatment for this fall, nor does he attest to the details of any interactions he had with these defendants about the fall.  Instead, plaintiff claims that "staff" had made it "a policy" to ignore, retaliate and conspire against, him, citing an inmate complaint faulting Nurse Thorne for failing to document her evaluation of Williams after his October 3, 2016, fall.  (*See* dkt. #142, at 67.)  Even assuming Thorne failed to create such a document, that failure is not evidence that she ignored a clear need for medical attention in December 2016, nor is it evidence from which a reasonable jury could find a larger policy to ignore him.  As such, Thorne, Valerius, Anderson, Walters and Beaver are entitled to summary judgment on this claim as well.

### 4.    Delayed meeting and failure to treat testicular pain by Warner

Next, plaintiff claims that then interim Heath Services Manager Warner wrongfully delayed a July 2016 meeting that Columbia's warden had set up to discuss Williams' health issues, and further ignored his complaints about testicle pain from March to August of 2016.  Although the record shows that a meeting to discuss Williams' numerous medical concerns was delayed by over two months, that delay was supported by legitimate reasons, and the record does not support a finding that this delay caused Williams unnecessary pain

or worsened any of his conditions.  *See Williams v. Liefer*, 491 F.3d 710, 716-17 (7th Cir. 2007) (a delay causes harm if plaintiff endures pain while waiting for treatment).

Specifically, the record reflects that on May 19, 2016, in response to Williams' numerous HSR's, defendant Warner notified Williams that she had scheduled a meeting for him to meet with staff members from security, psychological services and his housing unit members on May 24, 2016.  Warner further directed Williams to bring a prioritized list of concerns to the meeting.  Because she was not scheduled to work on May 24, Warner also asked Nurse DeYoung to staff that meeting.  However, DeYoung noted by later memo that the meeting was cancelled "due to multiple concerns/questions" and "incomplete information."  (Ex. 1018 (dkt. #122-1) 22.)  Warner then rescheduled the meeting for a date and time she knew that would be available to everyone -- July 14, 2016.  That meeting was attended by plaintiff, Warner, Nurse DeYoung, and Social Worker Westover.  During what amounted to a two-month delay, plaintiff has submitted *no* evidence that he was being denied medical treatment, and the only evidence as to the reason for this relatively short delay was a scheduling issue over which defendant Warner had no control.  Thus, there is no reason from which a reasonable jury could infer the delay was the result of Warner's deliberate indifference to plaintiff's serious medical need.  *See Forstner v. Daley*, 62 F. App'x 704, 706 (7th Cir. 2003) (26-month delay between injury and surgery, caused by transfer of inmate and scheduling appointments not deliberate indifference); *Zimmerman v. Prison Health Servs., Inc.*, 26 F. App'x 202, 203 (7th Cir. 2002) (delay due to "bureaucratic obstacles" and "scheduling difficulties" is not deliberate indifference).

As for plaintiff's claims that Warner ignored his complaints about testicular pain, the evidence of record is equally deficient.  First, there is no dispute that Williams received medical attention for this issue.  On March 25, 2016, Williams was seen by a urologist, who recommended a follow up in six months to consider surgery, if his symptoms persisted. Warner's last day as interim manager at Columbia was July 28, 2016, and she denies canceling any follow-up appointments without contradiction, adding that she was not even qualified or authorized to cancel offsite specialty appointments.  In any event, plaintiff's medical records show that after his March 25 appointment, Dr. Syed signed the urologist's recommendations on March 29, and ordered a scrotal support for Williams on April 15, 2016.  However, Dr. Syed did *not* order a referral to a pain clinic.

Before Warner left Columbia, the record also confirms that Nurse Whalen had attempted to see Williams for his complaints about pain and swelling in his testicles on June 1, 2016, but he refused to be examined by her, ostensibly because there was no witness in the room to observe her examining him.  On June 10, 2016, Nurse Anderson further measured Williams for scrotal support with compression shorts, and on April 19, 2017, Williams was seen for follow-up about the scrotal support and was issued an athletic supporter for better immobility.  Plaintiff nevertheless claims that defendant Warner made misrepresentations about the severity of his symptoms, citing a progress note dated June 2, 2016.  (Dkt. #96-1, at 58.)  He further claims that Warner failed to review his medical records adequately on a variety of issues.  However, the June 2nd progress note shows that Warner reported Williams' "cysts the size of tennis balls in his scrotum which cause him [to] walk slowly," and that she:  "Reviewed testicular US reports dated 1/7/16, 11/19/15

54

and indicating small hydroceles.  Advised will make sure scrotal support is ordered." (*Id.* at 58-59.)

Given that Williams received his scrotal support on June 10, therefore, the record does not permit a finding that Warner (or any other HSU staff) were deliberately indifferent to Williams' complaints of testicle pain.  Instead, the medical records show that the nursing staff were appropriately deferring to Dr. Syed's judgment that Williams should receive scrotal support items from March through April 2016.  Accordingly, there is no basis for a reasonable jury to infer that defendant Warner handled Williams' complaints about testicular pain with deliberate indifference, and she, too, is entitled to summary judgment.

## III.  First Amendment retaliation

The court now turns to plaintiff's separate claims that defendants Fry, Whalen, Pafford, Vickrey and Stange refused to place him in Columbia's SMU because of his inmate complaints in violation of his First Amendment rights.  "An act taken in retaliation for the exercise of a constitutionally protected right violates the Constitution." *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000).   To prove a retaliation claim under the First Amendment, Williams must prove that: (1) he was engaged in a constitutionally protected activity; (2) he suffered a deprivation that would likely deter a person from engaging in the protected activity in the future; and (3) the protected activity was a motivating factor in defendants' decision to take retaliatory action. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (citing *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)).

Defendant Pafford is entitled to summary judgment because no evidence of record suggests that she actually delayed Williams' x-ray.  As such, plaintiff's claim against her fails at the second element.  Defendant Whalen is also entitled to summary judgment because no evidence of record suggests that she even knew about Williams' inmate complaints.  *Morfin v. City of e. Chi*, 349 F.3d 989, 1005 (7th Cir. 2003) ("The protected conduct cannot be proven to motivate retaliation if there is no evidence that the defendants knew of the protected activity.") (quotation marks and brackets omitted) (quoting *Stagman v. Ryan*, 176 F.3d 986, 999-1000 (7th Cir. 1999)).  Moreover, even assuming plaintiff had evidence that Whalen was aware of his inmate complaints, there is no dispute that she played no personal part in assigning him to the general population or denying his request for a wheelchair restriction.  As for denying Williams' medications, the evidence shows that in August of 2015, Whalen took steps to *provide* Williams his prescribed cream; and that in February of 2016, she attempted to fill the Bactroban prescription, but it was not filled because Bactroban was not an approved medication.  Accordingly, plaintiff has failed to offer sufficient evidence for a reasonable jury to infer that Whalen took any adverse action against Williams, and certainly none to infer that Whalen sought to punish Williams for filing grievances.

As for his claims against defendants Fry, Vickrey and Stange, plaintiff also offers no evidence suggesting that when Williams was transferred to Columbia's general population in October of 2015, they ever knew about his existing inmate complaints, much less recommended his placement in the general population to punish him for filing inmate complaints.  Indeed, all the contemporaneously articulated reasons for recommending

Williams' placement in the general population relate *only* to defendants' belief that he did not require special treatment because:  (1) he did not suffer from a mental health condition; and (2) he was sufficiently mobile to function in general population.  Although plaintiff's conclusory claim that this decision was retaliatory was sufficient to survive screening, he had to come forward with evidence at summary judgment that defendants' recommendation he be placed in the general population was intended to punish him for engaging in protected conduct, other than the mere fact that he had filed inmate complaints in the past.  *See Devbrow v. Gallegos*, 735 F.3d 584, 588 (7th Cir. 2013) ("Even though Devbrow's verified complaint alleges retaliation, his speculation regarding the officers' motive cannot overcome the contrary evidence that [defendants'] actions were benign.") (citations omitted).  Since he has not, defendants Pafford, Whalen, Fry, Vickrey and Stange are entitled to summary judgment on plaintiff's retaliation claims as well.


## IV.   State law claims

Finally, the parties have cross-moved for summary judgment on plaintiff's numerous, other claims sounding in Wisconsin tort law.  The general rule is that federal courts should relinquish jurisdiction over state law claims if all federal claims are resolved before trial.  28 U.S.C. § 1367(c)(3); *Burritt v. Ditlefson*, 807 F.3d 239, 252 (7th Cir. 2015); *see also Groce v. Eli Lilly & Co.*, 193 F.3d 496, 499-501 (7th Cir. 1999) ("[I]t is well established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").  An exception to this general rule arises in circumstances in which a state law claim might be

time barred. *See Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007). That exception does not apply here.

Specifically, the shortest statute of limitations for some of plaintiff's state negligence claims would be three years, *e.g.,* Wis. Stat. § 893.55 (medical malpractice), § 893.54 (injury to the person), and some claims could have begun to run at the end of May of 2015, when plaintiff transferred to Columbia and began complaining that he did not receive his transferred property and prescription medications. Plaintiff filed this lawsuit slightly more than a year later, on July 1, 2016, which should toll the running of that limitations period from that point until the "final disposition" of his claim in this court. *See* Wis. Stat. § 893.15; *see also Artis v. District of Columbia*, 138 S. Ct. 594, 598, 199 L.E.2d 473 (2018) (bringing state law claims in federal court stops the clock on the state statute of limitations for those claims). Since Williams still has time to pursue these claims in state court, this exception to the general rule does not apply.

Another exception to the general rule favoring relinquishing supplemental jurisdiction over state law claims arises if they are "easily shown to have no possible merit," in which case "dismissing it on the merits is a time saver for everybody." *Korzen v. Local Union 705*, 75 F.3d 285, 288-89 (7th Cir. 1996). Such is not the case here. Defendants first seek summary judgment on Williams' state law medical malpractice claims against defendants Roeker, Knapp, Bittelman, Newbury, T. Anderson, Valerius, Whalen, Mashak, DeYoung, Walters and Beaver, on the ground that they are not "health care providers" subject to medical malpractice claims in Wisconsin. Defendants' position is that the exclusive remedy for medical malpractice claims in Wisconsin is Wis. Stat. Ch. 655, and

since Wisconsin law does not recognize medical malpractice claims against nurses or correctional officers, the court should enter judgment in their favor on negligence claims against those defendants.  However, as this court has previously explained, Wisconsin's medical malpractice statute generally does not apply to state-employees, Wis. Stat. § 655.003, and Wisconsin common law supports the existence of a negligence claim against state-employed nurses.  *Carter v. Griggs*, No. 16-cv-252-wmc, 2018 WL 1902885, at *7 (W.D. Wis. Apr. 20, 2018) (accepting that common law negligence claims against state-employed nurses appear cognizable).  Other judges and courts have adopted this view as well.  *See Smith v. Hentz*, No. 15-cv-633-jdp, 2018 WL 1400954, at *4 (W.D. Wis. Mar. 19, 2018) (state-employed nurses may not be subject to Wis. Stat. Ch. 655, but may be sued on a theory of common law negligence); *Killiam v. Nicholson*, No. 17-c-895, 2018 WL 1902587, at *3 (E.D. Wis. Apr. 20, 2018) (same); *Ravenwood-Alexander v. Beahm*, No. 17-cv-7-pp, 2018 WL 4188472, at *9 (E.D. Wis. Aug. 31, 2018) (same).

Last, defendants seek summary judgment on plaintiff's state law negligence/medical malpractice claims on the ground that he failed to provide expert testimony in support. Under Wisconsin law, however, expert testimony is necessary to establish the applicable standard of care *except* where a layperson could conclude from common experience that the plaintiff's injury would not have occurred if the provider had used proper care and skill. *Gil v. Reed*, 381 F.3d 649, 659 (7th Cir. 2004).  Defendants do not develop an argument as to why these they are entitled to a finding that this exception does not apply here, and in any case, Wisconsin courts are generally in a better position to make that determination.

Accordingly, the court will dismiss all of plaintiff's state law claims in this lawsuit without prejudice for lack of jurisdiction, and he may pursue those claims in state court.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment (dkt. #113) is GRANTED and Williams federal claims are dismissed with prejudice, while his state law claims are dismissed without prejudice as set forth above.

2. Plaintiff's motion for summary judgment (dkt. #92) is DENIED.

3. Plaintiff's motions (dkt. ##155, 169, 170, 179, 185) are also DENIED.

4. The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 25th day of February, 2022.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge